**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**CENTRAL GULF LINES, INC., In Personam and S/S GREEN VALLEY, In Rem, Defendants-Appellees.**

No. 81–3383.

United States Court of Appeals,
Fifth Circuit.

Feb. 28, 1983.

William French Smith, Atty. Gen., James A. Lewis, Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellant.

Jones, Walker, Waechter, Poitevent, Carrere, Denegre, John J. Broders, James E. Wright, III, New Orleans, La., for defendants-appellees.

Before WISDOM, REAVLEY and TATE, Circuit Judges.

REAVLEY, Circuit Judge:

The United States filed this maritime contract claim, seeking approximately $53,000 for recoupment of the value of cargo and for freight payments made for shipment of undelivered cargo, from Central Gulf Lines, Inc. ("Central") and its vessel, the S/S GREEN VALLEY. After a nonjury trial, the district court rendered judgment in favor of the government for part of

its freight recoupment claim, but denied damages for the value of the undelivered cargo. The United States appealed. We affirm, holding that under these facts the United States is not entitled to recover for either the value of undelivered cargo or for freight charges beyond the amount allowed by the district court.

### I. *Factual Background*

In 1974 Central and the government of South Vietnam agreed to the carriage on board the S/S GREEN VALLEY of numerous consignments of urea being shipped from various ports in Louisiana to Saigon for use as fertilizer. The parties dispute whether the United States ever held actual title to the urea and the record is unclear on this point. It appears either that the United States, acting through the Agency for International Development ("AID"),[1] bought the urea from American suppliers and later transferred title to the South Vietnamese government, or that the United States (through AID) loaned money to South Vietnam to purchase the urea. The precise mechanism is unimportant for purposes of our opinion here; either way the transaction is fairly characterized as a loan from AID, or the United States, to South Vietnam. It is undisputed that this "loan" has never been repaid. What is important is that prior to the arrival of the shipment in Saigon, the South Vietnamese government had sold and transferred title to the urea to private Vietnamese importers who produced the original bills of lading at the dock in Saigon to receive the goods.

AID executed five essentially identical but separate contracts with Central for the carriage of five shipments of bulk and bagged urea. These contracts were in the form of a standardized supplier's certificate and agreement. Section 4 of each certificate obligated Central to make prompt refund to AID in the event of breach or nonperformance of the contract.[2]

Central then accepted the five loads of urea, two in bulk and three packaged in bags, issued appropriate bills of lading and received payment in full from AID for freight charges. Upon arrival in Saigon, the cargo was examined by Hoditas, a South Vietnamese firm hired by Central to determine the condition and quantity of urea delivered. The Hoditas report on cargo landed revealed delivery of less urea than the quantities specified in the bills of lading. As a result, AID made demand on Central for refund of freight charges and for the value of the missing urea. When Central rejected that demand, AID filed this suit for breach of the five contracts. The suit was filed in 1976, approximately one and one-half years after the cargo was delivered and one year subsequent to the fall of the South Vietnamese government.

### II. *Claim for Value of Undelivered Cargo*

As noted earlier, the United States makes two kinds of claims based on the shortages of urea at delivery: one for the value of missing urea, and another for the cost of freight charges paid for shipping the undelivered urea. We examine first the claim for value and ask the threshold question whether the United States has any type of contractual relationship with Central that permits it to maintain such a claim. We conclude that it does not, following the reasoning of precedent existing in this circuit.

---

1. AID is an unincorporated agency within the Department of State. The district court made a factual finding that AID at one point held title to the five shipments of urea and later transferred ownership to the National Food Organization, the agency of the South Vietnamese government that sold the shipments to private Vietnamese importers. We need not decide whether the district court's finding on the possession of title is clearly erroneous for the reason explained in the text.

2. Section 4 of each certificate prescribed:

The supplier will, upon the request of A.I.D., promptly make appropriate refund to A.I.D., plus interest at the rate of six (6) percent per annum from the time of payment to the supplier, in the event of

(a) his nonperformance, in whole or in part, under said contract, including any failure to pay despatch, or

(b) any breach by him of any of his undertakings of this Certificate of Agreement, or

(c) any false certification or representation made by him in this Certificate and Agreement or in the Invoice-and-Contract Abstract on the reverse hereof.

In *United States v. Waterman Steamship Corp.*, 471. F.2d 186 (5th Cir.1973), the Waterman Company contracted to ship certain goods abroad for the Cooperative of American Relief Everywhere, Inc. ("CARE"), a private and nonprofit voluntary relief organization. A contract of carriage was executed by Waterman and CARE. The United States, acting through AID, agreed to reimburse CARE for the cost of shipping the goods. To this end, AID executed a supplier's certificate and agreement with Waterman whereby AID agreed to pay all freight charges. AID paid the shipping costs but then discovered that Waterman had charged a rate of freight in excess of prevailing rates—such action constituting a breach by Waterman of a provision in the supplier's certificate.

The United States then brought suit against Waterman to recover the excess freight charges paid. One defense advanced by Waterman was that the government's suit was time-barred by the one-year limitations period provided for in the bill of lading or contract of carriage under which the goods were shipped. This court rejected that defense, reasoning that because the United States was not a party to the contract of carriage, its suit for overcharges brought under the supplier's certificate could not be barred by the limitations period in the contract of carriage. 471 F.2d at 188–89.

■ The contractual arrangements in the case at hand mirror those in *Waterman Steamship*. As that case makes clear, the contractual obligations arising under the supplier's certificate and agreement are distinct from those existing under the contract of carriage. The only cause of action for which the United States brought suit in that case (and, indeed, the only one it possessed) was an independent one arising out of its supplier's certificate with Waterman. 471 F.2d at 188. That supplier's certificate governed only the costs of freight to be paid by the United States. Likewise, in our case the only contract to which the United States is a party, the supplier's certificate with Central, concerns the cost of freight charges. Any suit for recovery of the *value* of missing urea would have to be grounded upon a breach of the contract of carriage, to which the United States is not a signatory.[3] The proper parties to sue for the value of any missing urea are the South Vietnamese government or the private Vietnamese importers that bought title to the cargo. It is undisputed that these parties have never made any claim against Central for loss of cargo (even though the shipment was delivered approximately one year before the South Vietnamese government collapsed). Thus, the United States, because it was not the owner of the missing urea, received no assignment of claim by the owner, and enjoyed no guarantee of loan payment by Central, has no interest entitling it to recover from Central the value of the urea.

The district court disallowed any recovery for the value of undelivered urea on the ground that the United States had failed to introduce evidence of the market value of the urea or of the price paid for this urea. The district court thus reached the proper result with regard to the government's claim for value, but for the wrong reason.[4] Because we reach the same *result* as to the claim for value, we affirm the district court's denial of recovery for this element of the government's case.

### III. Claim for Cost of Freight Charges Paid

■ As the preceding discussion illustrates, the United States is entitled at most

---

3. *Waterman Steamship* disposes of the argument that the United States could be considered the "shipper" here and thereby a party to the contract of carriage. 471 F.2d at 189 n. 4. Moreover, the United States has itself taken the position in the record that its claim in this suit is not based on the bills of lading or contract of carriage, but on the supplier's certificate. *See* R. I, 27, 47.

4. Even assuming, contrary to our conclusion here, that the United States could maintain an action for value of undelivered urea, it would be precluded from recovering anything under the reasoning in part III of our opinion, that the amounts lost were negligible and inevitable.

to recover for the cost of freight charges paid for that portion of urea found to be undelivered, the right of such recovery being grounded upon the supplier's certificate executed between Central and the United States. Central, however, argues vigorously that it should not be required to refund any portion of the freight costs because the amounts of urea missing are within the range of customary and expected loss in the shipping trade. We agree.

It has been held that certain minute losses of cargo will always occur in the process of loading, shipping and unloading and that, under recognized industry practice, carriers and ships should not be held liable for such loss up to a certain limit. For example, in *Northeast Petroleum Corp. v. S/S PRAIRIE GROVE,* 1977 AMC 2139 (S.D.N.Y. 1977), the court held that the measurement of petroleum cargoes is inexact at best and, therefore, the carrier would not be liable for shortages in gasoline and diesel fuel delivered up to the 0.005 industry-recognized loss tolerance. 1977 AMC at 2142-43 n. 2. Likewise, in *Palmco, Inc. and Fireman's Fund Insurance Co. v. American President Lines, Ltd. d/b/a American Mail Lines, Ltd.,* 1978 AMC 1715 (D.Or.1978), the court held that a carrier is not responsible for 0.5 percent of loss attributable to the film of palm oil left on the walls of the ship's holds and in the pumping lines when such cargo is transported in bulk. The court stated:

> Although defendant cannot explain away the full amount of the loss, it also contends that a certain small percentage of a bulk shipment of oil is always lost, despite the carrier's due diligence. This amount, known as a "tare," is the result of a film of oil left on the walls of the ship's holds, plus normal retention in the pumping lines. Defendant contends that the normal tare for bulk oil is .5%.
>
> Plaintiff contends that there is no legal basis for deducting .5% of the cargo unless provided for in the bill of lading. However, the carrier is not an insurer of the cargo. . . . Defendant's proof of an expected and normal loss of .5% rebuts plaintiff's prima facie case of unseaworthiness for that amount.

Defendant is not liable for any shortage of up to .5% per shipment. This completely disposes of any claims for shipments 4, 5, and 6 and reduces the claims for the four other shipments.

1978 AMC at 1722 (footnote omitted).

The record here provides some instructive information on the problems of shipping urea. Urea is a powder-like substance. The record reveals that when the shipments in question reached South Vietnam, they were actually unloaded 45 miles downriver from Saigon onto "lash barges" and then transported to Saigon, where they were unloaded onto the dock. The two shipments of bulk urea were unloaded by hand into clamshell buckets, first from ship to bucket to barge, and then from barge to bucket to dock. Obviously, any powder-like substance handled in this manner is going to leave a residue behind in the containers in which it is stored and transferred, and some spillage is unavoidable. The three shipments of bagged urea were unloaded manually by longshoremen who used large hooks to catch the bags (because fork lifts were unavailable). The hooks, a standard way of unloading bagged cargo received in Saigon (and in other international ports), undoubtedly produced tears in the bags, causing some loss of urea.

At trial N.V. Minh was called by both the government and by Central as a witness. Minh testified that he had been engaged in the shipping business approximately 32 years, most of that time in Vietnam, and that for eight years before the collapse of South Vietnam he was in charge of his own business which served as the Vietnamese agent for several international shipping companies, including Central. As agent the company "received" foreign vessels that called in South Vietnamese ports and attended to the loading and unloading of cargo. At the time of the fall of South Vietnam in 1975, AID assisted Minh and his family in escaping the country and coming to the United States.

Minh testified that for the eight years that he managed his own business, the com-

pany handled approximately six to seven hundred thousand tons of bulk shipments of fertilizer annually. He explained that a loss of from one and one-half to two percent of all bulk fertilizer shipments received in Vietnam was regarded as within the limit of tolerance.[5] Several reasons exist for excusing such losses in bulk shipments. First, Minh explained that it is recognized that discrepancies exist between the scales used at loading and unloading. Second, he described (as recounted earlier) the inevitable loss due to the transfer of bulk commodities by clamshell bucket and of bagged cargo by the use of large hooks. Third, he explained that urea (whether in bulk or bagged) loses weight due to the evaporation of moisture during the often months-long period in which it is being carried by ship to its final destination.

Minh also testified that with respect to *bagged* cargo, it is customary in the industry to ship extra, empty bags along on the expectation that some bags will be torn and the cargo will have to be re-bagged. In this case from 1,000 to 2,000 empty bags were sent along with each of the three bagged shipments of urea for this purpose. Finally, Minh testified that in over 30 years of being in the shipping business, he had never been involved in a claim where the shortages were as minuscule as the amounts involved here.

The United States asserts a claim for excess freight charges based on five shipments of urea in which the amounts delivered were less than the amounts specified in the corresponding bill of lading. Assuming the government's figures to be correct, *i.e.*, assuming them to represent the amounts of shortage proven by the record evidence,[6] then the maximum percentage of loss claimed by the government for each shipment would be:

| Type of Shipment | Claim No. | Percentage of Shipment Claimed as Lost by Government[7] |
|---|---|---|
| Bulk | 50017 | 0.278 |
| Bagged | 50018 | 0.238 |
| Bagged | 50019 | 0.340 |
| Bagged | 50020 | 0.334 |
| Bulk | 50021 | 1.08 |

It is apparent from these figures that the percentage of each shipment claimed by the United States to be undelivered approaches the *de minimis* level. The loss for the two bulk shipments, Claims No. 50017 and 50021, are obviously within the two percent tolerance limit explained by Minh to be internationally recognized for bulk cargo shipments.

We cannot say whether the percentages of loss for the three bagged shipments are within similarly-recognized international tolerance limits for *bagged* cargoes, because Minh's testimony does not indicate what such limits are. Rather, his testimony merely indicates that the tolerance limit for

5. Minh first stated that the 1½–2% tolerance limit was standard for all bulk cargo shipments received in Vietnam. R. II, 95. Later, upon questioning by the district judge, Minh clarified that the 2% tolerance limit for bulk cargoes was accepted internationally as well in the shipping industry, and that the limit was recognized for *any* commodity when shipped in bulk. R. II, 100–01.

6. We do not necessarily find that the amounts of shortage asserted by the government in each of the five shipments are numerically correct. Our own numerical calculations reveal certain discrepancies, at least with respect to some of the shipments, between the amounts of shortage claimed by the government and the amounts proved by the evidence in the record. Moreover, we detect certain errors in the district court's calculations of the amounts of shortage involved. Without becoming em-

broiled in these numerical calculations, we *assume*, for purposes of the discussion in text, that the maximum amounts of shortage as claimed by the government in this appeal are correct—this gives the government the benefit of the doubt with respect to the record evidence as to the amounts of shortage involved. In other words, we assume, without deciding, that the shortages in each shipment are as great as the government maintains they are.

7. These figures are reached for each claim by dividing the maximum shortage claimed to be lost by the government by the amount of urea specified in the bill of lading for each shipment. Thus, for example, in Claim No. 50017 dividing 29.271 metric tons claimed as lost by 10,537.-721 metric tons shipped yields 0.278, or approximately one-third of one percent of that particular shipment claimed as lost.

the same commodity when shipped in bags differs from the limit when it is shipped in bulk. Even without reference to the tolerance limit for shipments of bagged urea, however, we believe that the percentages of loss must be excused under this record. The largest percentage of loss in the three bagged shipments, that in Claim No. 50019, is only (approximately) one-third of one percent. Given the record evidence concerning how the bagged cargo was transferred by longshoremen using large hooks, given evidence that at least 1,000 empty bags were sent along with each shipment on the expectation that some bags would tear, and given evidence that urea (whether in bulk or bagged) loses weight due to evaporation of moisture, we hold as a matter of law that the losses here are excusable. Central has met its burden that these losses are inevitable and negligible ones for which it should not be considered at fault or for which it should be held accountable.

■ Our holding that the losses in both the bulk and bagged shipments are excusable should preclude the United States from recovering any damages on its claim for freight costs. The district court awarded $3,722.49 with interest as recovery for freight charges, thus allowing a partial recovery to the United States on its claim. Central has not filed a cross-appeal contesting this award, however, and thus cannot " 'attack the [district court's] decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary....' " *Alford v. City of Lubbock, Texas,* 664 F.2d 1263, 1272–73 (5th Cir.), *cert. denied,* 456 U.S. 975, 102 S.Ct. 2239, 72 L.Ed.2d 848 (1982), *quoting Morley Construction Co. v. Maryland Casualty Co.,* 300 U.S. 185, 191, 57 S.Ct. 325, 328, 81 L.Ed. 593 (1937). *See* 9 J. Moore, Moore's Federal Practice ¶ 204.11[3] at 4–44 (1982 ed.). As a result we must affirm the district court's award of $3,722.49 with interest for freight charges.

AFFIRMED.