**BLASSER BROTHERS, INC., Plaintiff–Appellee, Cross–Appellant,**

v.

**NORTHERN PAN–AMERICAN LINE, a/s d/b/a Nopal Caribe Line, Defendant–Appellant, Cross–Appellee,**

v.

**CONTINENTAL INSURANCE CO. OF NEW YORK, Defendant–Appellee, Cross–Appellant.**

No. 78–2667.

United States Court of Appeals, Fifth Circuit.

Oct. 15, 1980.

Rehearing Denied Nov. 12, 1980.

378

William B. Milliken, Miami, Fla., for defendant–appellant, cross–appellee.

Rodney Earl Walton, Timothy J. Armstrong, Miami, Fla., for plaintiff–appellee, cross–appellant.

Before GOLDBERG, GARZA and REAVLEY, Circuit Judges.

GARZA, Circuit Judge:

This case involves a claim for damaged cargo instituted by Blasser Brothers, Inc. against a seagoing carrier and the company which insured the shipment, as well as a cross–claim by the insurance company against the carrier. The district court awarded damages, interest and taxable costs against the insurance company and the carrier, and allowed the insurance com-

pany to recover against the carrier on its cross–claim. The court also ordered the insurance company to pay reasonable attorneys' fees to Blasser Brothers. Presently before this court are the appeal and cross–appeals of the parties involved. Finding no error in the district court's decision, we affirm.

Blasser Brothers is an export company based in Miami, Florida. Its sole stockholders and officers are Eduardo Blasser, Jose Blasser and Terry Blaser. One of the products exported by Blasser Brothers is Eterna–Glow Cosmetics, which is a private label cosmetics corporation owned and operated by the same three people that own Blasser Brothers. Eterna–Glow does not manufacture its own goods. Rather, it contracts with a manufacturer to provide the formula and packaging of the particular line of cosmetics. Blasser Brothers serves as a supplier to Impex Colonial Transoceanic, which is based in Panama City, Panama. Impex Colonial is a distributor of American products, including Eterna–Glow Cosmetics, which is owned and operated by Eduardo and Jose Blasser.

The present shipment involved cosmetics manufactured by a corporation in New Jersey and transported overland to the Blasser Brothers' warehouse in Miami. The cosmetics, which were contained in 158 cartons, were packaged by the New Jersey manufacturer. The cartons were of heavy corrugated construction and sealed with gum tape. Inside each carton was a number of smaller cardboard boxes, each containing twelve plastic cosmetic kits. These cartons remained unopened and intact at Blasser Brothers' warehouse. Upon delivery to Blasser Brothers' warehouse, however, Jose Blasser customarily opened a few boxes to examine the new colors and shades of the cosmetics. Based upon such a visual inspection, he found them to be in perfect condition. In August, 1976, shortly after receiving the cartons of cosmetics, Jose Blasser contacted United Dispatch Services, a freight forwarder and insurance agent for Continental Insurance Company, in regard to a shipment of 404 cartons of merchandise. 158 of these cartons contained the cosmetics already mentioned and 246 cartons contained furniture.

Based upon an invoice from Eterna–Glow Cosmetics, United Dispatch Services valued the shipment at $42,000 and issued a certificate of insurance in that amount from Continental Insurance Company. The certificate of insurance specifically covered all risks, including war. United Dispatch Services also prepared the bill of lading for the carrier, Northern Pan–American Lines [NOPAL], and a shipper's export declaration. A few days later, a trailer arrived at Blasser Brothers' warehouse. The trailer belonged to Maritime Cartage and was leased to NOPAL. After packing the shipment into the trailer, Blasser Brothers notified NOPAL that it was ready for delivery to the carrier. Maritime Cartage's driver supplied the seals, which were placed on the trailer, while Blasser Brothers furnished the padlocks. After sealing and locking the trailer, the Maritime Cartage driver issued a clean delivery receipt. Neither Jose Blasser nor any of his employees had noticed any defects in either the cartons or the trailer.

The trailer was loaded on the deck of the M/V Lindinger Amber. Blasser Brothers had no knowledge that the trailer would be stowed on deck, although an employee of Caribbean Agencies, a steamship agent for NOPAL, stated that according to that particular stowage plan, all trailers were stowed on deck. This individual stated that such stowage was customary.

This ship sailed on August 16, 1976. The day after the ship sailed, NOPAL issued a clean bill of lading showing no exceptions. The trailer was discharged at Las Minas, Panama, on August 21, 1976. A dock inspection of the exterior of the trailer conducted by NOPAL's agents revealed gashes in its side. NOPAL's agents did not open the trailer, nor did they notify the consignee, Impex Colonial. The trailer was placed in the customs yard, which is uncovered and exposed to the elements. About five days later, NOPAL hired Cargas Movibles, S. A., to transport the trailer from Las Minas to

the warehouse of Banco Exterior in the Free Zone, a trip of ten or twelve kilometers.

When Banco Exterior employees opened the trailer, they discovered that the inside of the trailer was wet and that parts of the cargo had become soaked. The warehouse manager called Eduardo Blasser, as well as NOPAL's agent, requesting an inspection. By the time Eduardo Blasser arrived, unloading had already begun. Eduardo Blasser testified that the floor of the trailer was wet and that a number of cartons were soaked.[1]

The wet cartons were then separated from the dry ones. The wet furniture was dried, cleaned, repacked and later sold. Forty–five cartons of cosmetics which had remained dry were also removed from the premises and later sold. 113 cartons which were either soaked or had come into contact with water remained in the warehouse. Each cosmetic kit in these cartons was cleaned, dried, and recoopered and stored in the Banco Exterior warehouse. The cosmetic kits remain there to this day. On August 27, 1976, an employee of Cargas Movibles inspected the empty trailer. This employee discovered gashes on the side, rips in other places and a hole in the roof. The hole in the roof occurred due to a faulty patching job done at an earlier time.

On August 30, 1976, Banco Exterior formally notified NOPAL of the damage. Blasser Brothers timely notified Continental of the damage and its claim. Blasser Brothers claimed a loss of $23,928.93. Eduardo Blasser testified at trial that each cosmetic kit in the 113 cartons had come in contact with water. Based upon his experience in the cosmetics industry and as a chemist, Eduardo Blasser did not believe that the cosmetics in the 113 wet cartons could be commercially used. He believed that because of the water damage, whether it was obvious or not, the kits could have been contaminated by fungi and bacteria. In November, 1976, Continental sent a surveyor from Miami. The surveyor performed no chemical or microscopic examinations. He merely conducted a visual inspection. Of the 1810 dozen kits that had been contained in the 113 cartons, he chose only 41.5 dozen, which were obviously water damaged, and 325.4 which showed signs of mold or fungi. The surveyor determined that the remaining kits were not damaged.

He did believe, however, that there might have been microbial contamination in all the kits. The surveyor, thus, sent samples to Continental but never informed Eduardo Blasser of any findings. Based upon the surveyor's report, Continental offered to pay $520, which accounted for only those kits clearly damaged. Continental refused to pay for those kits containing visible mold contending that such mold was an inherent vice of such cargo. Blasser Brothers refused to accept the offer.[2]

In August, 1977, a mycologist retained by Continental, Dr. Syril B. Farber, examined the samples sent by the surveyor. Some samples had been marked by the surveyor as damaged and others as not damaged. Dr. Farber found that the undamaged samples contained aspergillus spores. She stated in her deposition, parts of which were read at trial, that aspergillus is a common airborne spore. She testified that the amount of spores found on the samples was an ordinary amount that would be found on a plate set on a windowsill. Dr. Farber had never examined cosmetics before and had no knowledge of F.D.A. standards regarding such cosmetics.

1. In Eduardo Blasser's deposition, he apparently exaggerated the amount of water in the trailer. In his deposition, he stated that the inside of the trailer looked like a river and that tanks of water could have been retrieved from the floor of the trailer. At trial, Eduardo Blasser admitted that his state of mind was one of disbelief and shock upon seeking the trailer. Even though he tempered his explanation of what he had seen, he still contended that there was a great deal of water in the trailer.

2. At trial, Continental Insurance Company withdrew its affirmative defense of inherent vice and offered to pay for both the moldy and the clearly damaged kits. This amount equaled less than $5000, and Blasser Brothers refused to accept it.

Parts of the deposition of Charles Schoch, a microbiologist, were also introduced at trial. Ninety percent of his testing experience concerns cosmetics. Most of his testimony is irrelevant, since he examined only samples that had been clearly contaminated by water, which claim Continental does not dispute. Schoch's remarks on aspergillus, however, shed some light on the problem before this court and, thus, are relevant. Schoch was examining samples that showed signs of mold. In the samples he inspected, he found Aspergillus Niger which he stated was a pathogenic fungi harmful to human beings. He also stated that Aspergillus Niger is present in the air, in the water and in the food we eat. Schoch stated that the F.D.A. forbids the presence of aspergillus in cosmetics.[3] Throughout all of the proceedings and litigation, NOPAL has never conducted any analysis or survey of the cargo.

## THE BURDENS OF PROOF

[1] NOPAL now contends that Blasser Brothers did not sustain its burden of proving damages and that the district court's finding of fact No. 31,[4] that all the samples examined by Dr. Farber were contaminated and contained a human pathogen, was clearly erroneous. The present dispute is governed by the Carriage of Goods by Sea Act, 46 U.S.C. §§ 1300–1315 [hereinafter COGSA].[5] Under COGSA, to establish a prima facie case of liability against the carrier, the shipper, Blasser Brothers in this case, has the burden of proving that the cargo was received by the carrier, NOPAL, in good condition and the cargo was damaged upon delivery by the carrier at its destination. *Associated Metals & Minerals Corp. v. M/V Rupert De Larrinaga*, 581 F.2d 100, 101 (5th Cir. 1978); *United States v. Lykes Bros. Steamship Co., Inc.*, 511 F.2d 218, 223 (5th Cir. 1975).

■ A bill of lading is prima facie evidence that the carrier received the goods as described therein and creates a rebuttable presumption that the goods were delivered to the carrier in good condition. *Associated Metals & Minerals Corp. v. M/V Rupert De Larrinaga*, 581 F.2d at 101; *Horn v. Cia de Navegacion Fruco, S. A.*, 404 F.2d 422, 435 (5th Cir. 1968), *cert. denied*, 394 U.S. 943 (1969); *E. T. Barwick Mills, Inc. v. Hellenic Lines Limited*, 331 F.Supp. 161, 164 (S.D.Ga. 1971), *aff'd*, 472 F.2d 1406 (5th Cir. 1973). In other words, the plaintiff's prima facie case regarding receipt by the carrier in good condition is satisfied by the introduction into evidence of the clean bill of lading. *Emmco Insurance Co. v. Wallenius Caribbean Line, S. A.*, 492 F.2d 508, 513 (5th Cir. 1974); *Cummins Sales & Service, Inc. v. London and Overseas Insurance Co.*, 476 F.2d 498, 500 (5th Cir. 1973), *cert. denied*, 414 U.S. 1003, 94 S.Ct. 359, 38 L.Ed.2d 239 (1973); *Interstate Steel Corp. v. S. S. "Crystal Gem"*, 317 F.Supp. 112, 118 (S.D.N.Y. 1970).

■ Once the shipper has presented a prima facie case, the carrier then has the burden of proving that it exercised due diligence to prevent the damage or that the harm was occasioned by one of the excepted causes delineated in 46 U.S.C. § 1304(2).[6]

---

3. There is evidence in the record that although aspergillus is a common airborne spore, it is not present in cosmetics manufacturers' laboratories. Additionally, most cosmetic kits are not hermetically sealed because of the damage it would cause to both the plastic containers and the cosmetics, due to the intense heat needed for such sterilization. It is also undisputed that the opening of a cosmetic kit will expose the cosmetic to aspergillus spores. Thus, to prevent mold or fungus contamination, most cosmetics are manufactured with certain preservatives to prohibit such growth.

4. Finding of Fact No. 31 reads as follows:
   In August, 1977, a mycologist retained by CONTINENTAL during discovery analyzed four (4) samples of cosmetics. Two of these samples had been noted as damaged, while the others had been marked undamaged. She found that all samples had been contaminated by mold spores. Even the "undamaged" samples contained aspergillus, a human pathogen.

5. COGSA governs any carriage of goods by sea involving a bill of lading. 46 U.S.C. §§ 1302, 1306. Additionally, in the present case, the bill of lading itself states that it is subject to the provisions of COGSA.

6. 46 U.S.C. § 1304(2) provides as follows:

*Tupman Thurlow Co., Inc. v. S. S. Cap Castillo*, 490 F.2d 302, 304 (2nd Cir. 1974); *Horn v. Cia de Navegacion Fruco, S. A.*, 404 F.2d at 435. Further, once the shipper has presented its prima facie case, the carrier, if unable to rebut the shipper's position, will be liable for the entire damaged cargo unless it can prove what portion was not actually damaged or was damaged under one of the exceptions of § 1304(2). *J. Gerber & Co. v. S. S. Sabine Howaldt*, 437 F.2d 580, 588 (2nd Cir. 1971); *Swedish American Lines v. Evans Products Co.*, 431 F.2d 869, 870 (4th Cir. 1970).

The carrier bears this heavy burden because of its legal responsibility to exercise due diligence to make the ship seaworthy, to properly man, equip and supply the ship and to make all parts of the ship in which the goods are carried fit and safe for the reception, carriage and preservation of the goods. *Socony Mobil Oil Co., Inc. v. Texas Coastal & International, Inc.*, 559 F.2d 1008, 1010 (5th Cir. 1977); *Interstate Steel Corp. v. S. S. "Crystal Gem"*, 317 F.Supp. at 118; 46 U.S.C. § 1303(1). *See also Schnell v. The Vallescura*, 293 U.S. 296, 304, 55 S.Ct. 194, 196, 73 L.Ed. 373 (1934) (law imposes on carrier extraordinary duty with respect to the safe care and delivery of items entrusted to it by the shipper).

█ If the carrier is able to rebut the shipper's prima facie case by availing itself of one of the exceptions, the burden then returns to the shipper. The shipper must then show that there were, at least, concurring causes of loss in the fault and negligence of the carrier.[7] *United States v. Lykes Bros. Steamship Co., Inc.*, 511 F.2d at 224; *J. Gerber & Co. v. S. S. Sabine Howaldt*, 437 F.2d at 588.

█ If the shipper is able to show such negligence, the burden rebounds to the carrier, who then has the difficult task of proving the portion of the loss caused by the negligence and the portion caused by the exception. As mentioned earlier, failure to differentiate such damage results in full liability for the loss against the carrier.

In the present case, Blasser Brothers delivered 404 dry cartons of furniture and cosmetics to the custody and control of NOPAL. NOPAL issued a clean bill of lading with no exceptions. Upon arrival at the Banco Exterior warehouse, 113 cartons of

(2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—

(a) Act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship;

(b) Fire, unless caused by the actual fault or privity of the carrier;

(c) Perils, dangers, and accidents of the sea or other navigable waters;

(d) Act of God;

(e) Act of war;

(f) Act of public enemies;

(g) Arrest or restraint of princes, rulers, or people, or seizure under legal process;

(h) Quarantine restrictions;

(i) Act or omission of the shipper or owner of the goods, his agent or representative;

(j) Strikes or lockouts or stoppage or restraint of labor from whatever cause, whether partial or general: *Provided*, That nothing herein contained shall be construed to relieve a carrier from responsibility for the carrier's own acts;

(k) Riots and civil commotions;

(*l*) Saving or attempting to save life or property at sea;

(m) Wastage in bulk or weight or any other loss or damage arising from inherent defect, quality, or vice of the goods;

(n) Insufficiency of packing;

(*o*) Insufficiency or inadequacy of marks;

(p) Latent defects not discoverable by due diligence; and

(q) Any other cause arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier, but the burden of proof shall be on the person claiming the benefit of this exception to show that neither the actual fault or privity of the carrier nor the fault or neglect of the agents or servants of the carrier contributed to the loss of damage.

7. The shipper may also have an additional burden when the cargo damage may have resulted from a hidden defect present at the time of shipment. In such a case, the shipper is faced with two choices. It either has the burden of proving that the cargo was in good condition when delivered to the carrier, or it must show that the damage was caused by the carrier's negligence and not by an inherent vice. *See Elia Salzman Tobacco Co., Ltd. v. SS Mormacwind*, 371 F.2d 537, 539 (2nd Cir. 1967).

cosmetics were wet. In light of Eduardo Blasser's experience with cosmetics and his awareness of F.D.A. standards, he understandably feared microbial contamination.

Dr. Farber, the mycologist, testified that all the samples, both visibly damages and undamaged, contained aspergillus spores. Her testimony seemed to downplay the presence of such spores on the cosmetics by noting that they are airborne spores, which can be found almost anywhere. The testimony of the microbiologist Schoch, however, seemed to indicate that although they are common airborne spores, they are not present in cosmetics laboratories, and they are not allowed to be found in unopened cosmetic kits.[8] Schoch stated that regardless of its ubiquitous nature, aspergillus is a pathogen, harmful to human beings, when found in cosmetics.[9]

■■■ In light of the above testimony, there is more than sufficient evidence to support the district court's finding of fact that the cosmetic kits were contaminated by aspergillus spores.[10] We may only over-

turn such a finding of fact if it is clearly erroneous. Under this standard, the district court's finding of fact No. 31 must stand. Thus, having shown delivery of the cargo to the carrier in good condition and damage upon arrival in Panama, Blasser Brothers has proven its prima facie case.

■■■ The burden, thus, shifts to NOPAL to prove that the damage was done by an uncontrollable cause of loss under § 1304(2) or that due diligence was exercised to avoid that damage. NOPAL did absolutely nothing in regard to attempting to protect the cargo once the damage in the trailer was discovered, or inspecting the damaged cargo upon delivery. The only surveyors were sent by Impex Colonial and Continental. In its answer, NOPAL relied generally on § 1304(2) for its defenses, especially those of perils of the sea, § 1304(2)(c), and inherent vice, § 1304(2)(m).[11]

There was no evidence presented at trial regarding perils or accidents of the sea, and NOPAL introduced no evidence that the damage was the result of an inherent vice.[12]

---

**8.** The evidence in this case demonstrates that once such cosmetic kits are opened, they are no longer free from aspergillus spores. Blasser Brothers contends in this case that the kits were contaminated by the intrusion of water into the kits. In the instant case, each kit in the 113 cartons was opened, so as to clean and dry the cosmetics. Whether the aspergillus spores entered the kits by way of water damage or because the kits were exposed to the air due to the cleaning operations is of little import, since in either case the accumulation of spores was caused by the actions of NOPAL.

**9.** Schoch's testimony is somewhat ambiguous, since the samples he examined were visibly covered with mold. There is no doubt that the presence of mold on cosmetics is totally unacceptable. Nonetheless, his testimony seemed to indicate that the presence of aspergillus spores on commercially available cosmetic kits was as unacceptable as kits containing visible mold growth.

**10.** Schoch's testimony could have been clearer. It is possible that the district court could have concluded from his testimony that aspergillus is only dangerous when it is in its mold stage. It was also possible to conclude from Schoch's testimony, as the district court did, that the mere presence of aspergillus spores on saleable cosmetics is sufficient to contaminate them. When a district court is faced with two such

possibilities, the inference it chooses to make will not be disturbed unless clearly erroneous. *Socony Mobil Oil Co., Inc. v. Texas Coastal & International, Inc.*, 559 F.2d at 1011. As stated in the text of the opinion, we do not find the district court's finding of fact to be clearly erroneous.

**11.** During trial, Continental withdrew its affirmative defenses, including that of inherent vice, and, thus, this court will not address Continental's claims regarding such defenses.

**12.** The surveyor sent by Continental claimed that many of the cosmetic kits contained mold, but no water. He also conducted a nitrate test which showed the absence of any traces of salt water. Based upon these findings, NOPAL contends that the damage must have been caused by humidity and high temperatures, both allegedly inherent vices, rather than by any negligence on its part. The court finds these arguments specious, in light of the fact that the damage was more likely caused by rainwater due to the leak in the roof. There is evidence in the record that not only does it rain a great deal in Panama, but that it had rained during the time the trailer was in the customs yard in Las Minas before arrival at the Banco Exterior warehouse. There is also testimony that the color of the cosmetics will not necessarily run when placed in contact with water.

Dr. Farber, who was Continental's witness, did state at one point that she believed the spores had been on the cosmetics before shipment. Upon further questioning, however, Dr. Farber admitted that she had not tested any control samples of the cosmetics and could not actually determine within reasonable scientific probability whether there would have been spores on normal cosmetic kits. This admission couples with Dr. Farber's complete absence of experience with cosmetics and lack of knowledge of F.D.A. standards, dilutes any effect it might have had on NOPAL's attempt to show the existence of an inherent vice.

Beyond the fact that NOPAL did not introduce any reasonable evidence to demonstrate that the cargo was damaged prior to shipment, nor that it was damaged by any exception under § 1304(2), there is also considerable evidence that NOPAL breached its duty in caring for and stowing the trailer. The roof of the trailer had been patched before delivery to Blasser Brothers. There was testimony that the patch work had been done in a shoddy manner. The trailer was stowed on the deck of the ship without the knowledge of Blasser Brothers.[13] A damage report made by the captain of the ship and maintained in the office of Agencia Motonaves, S. A., business agent for NOPAL, states that the gashes in the side of the trailer were caused by stowage too close to something else. An employee of Agencia Motonaves also opined that the damage had been caused by leakage from the hole in the roof where the patch had come undone. These factors of improper handling and the absence of any contrary evidence by NOPAL are matters which a

district judge may consider in examining a carrier's defense. *See Compagnie De Navigation Fraissinet & Cyprien Fabre, S. A. v. Mondial United Corp.*, 316 F.2d 163, 169 (5th Cir. 1963).

In light of the above factors, the district court was completely correct in holding that NOPAL failed to meet its burden and had failed to rebut Blasser Brothers' prima facie case.[14]

### CONTINENTAL'S CROSS–CLAIM

NOPAL contends that Continental does not have a right to cross–claim, since the only party able to maintain an action against NOPAL is Blasser Brothers. NOPAL bases its argument on the fact that the insurance policy involved is a loan receipt policy, in which any amount paid to Blasser Brothers as the insured is considered a loan, repayable only to the extent of recovery by the insured from third persons. NOPAL contends that under such policies, the insured remains the real party in interest. NOPAL argues that the only time an insurer may institute a suit is when it has become subrogated to the rights of the insured. Since a loan receipt policy by its nature provides for no such subrogation rights, NOPAL argues that Continental can never bring suit.

█ The general rule is that an insurer has no right to institute action in the insured's name until it has made payment to the insured. *City Stores Co. v. Lerner Shops of District of Columbia, Inc.*, 410 F.2d 1010, 1011 (D.C.Cir.1969); *Bunge Corp. v. London and Overseas Insurance Co.*, 394

Thus, any trace of water may have disappeared by the time the surveyor arrived nearly two months later, especially since each kit had been cleaned and dried beforehand.

**13.** The district court found that NOPAL had deviated from its contract in allowing stowage on deck. It is clear that if there is no definite agreement one way or the other, a shipper is entitled to expect below deck storage, unless there is a showing of a different custom in that port. *See Encyclopaedia Britannica, Inc. v. SS Hong Kong Producer*, 422 F.2d 7, 14 (2nd Cir. 1969), *cert. denied*, 397 U.S. 964, 90 S.Ct. 998, 25 L.Ed.2d 255 (1970). Clearly, the testimony

of the employee of the carrier in this case to the effect that all cargo was stowed on deck is not sufficient to show a custom in that port.

**14.** Although we hold that NOPAL did not meet its burden, it would have been to no avail if it had. It is clear that had the burden shifted back to Blasser Brothers, there was enough evidence demonstrating negligence against NOPAL that the burden would have once again shifted to NOPAL. At that point, NOPAL's only avenue would have been to prove what damage was not caused by its negligence.

F.2d 496, 497 (2d Cir. 1968), *cert. denied*, 393 U.S. 952, 89 S.Ct. 376, 21 L.Ed.2d 363 (1968); *Corbin v. Aetna Life & Casualty Co.*, 447 F.Supp. 646, 652 (N.D.Ga.1978). At that point, the insurer becomes subrogated to the claims of the insured. In loan receipt policies, however, payment to the insured is considered only as a loan, and, thus, the insured remains the real party in interest. *Ketona Chemical Corp. v. Globe Indemnity Co.*, 404 F.2d 181, 184 (5th Cir. 1968); *Sanders v. Liberty Mutual Insurance Co.*, 354 F.2d 777, 778 (5th Cir. 1965); *See v. Emhart Corp.*, 444 F.Supp. 71, 74 (W.D.Mo.1977). The loan receipt policy was determined to be a legal document over sixty years ago. *Luckenbach v. McCahan Sugar Co.*, 248 U.S. 139, 39 S.Ct. 53, 63 L.Ed. 170 (1918).

■ However, in the present case, the court considers NOPAL's arguments to be unpersuasive. Continental has refused to pay Blasser Brothers the amount it requests. No loan or other payment on the policy has been forthcoming. If Continental had advanced the loan money, Blasser Brothers would have had no reason to make it a defendant, and, thus, there would be no cross-claim issue before us.

By refusing to advance any money, though, Continental remained liable to Blasser Brothers and faced the possibility that a federal court would order Continental to pay, rather than loan, Blasser Brothers the requested amount. Inevitably, such was the result. At that point, by being forced to pay, Continental became the subrogee, which would have given it the right to then sue NOPAL for recovery. Since NOPAL was a codefendant of Continental, allowing a cross–claim would serve the same purpose as granting judgment against Continental and then permitting it to sue NOPAL in a second action. Additionally, a second suit by the insurance company might have been barred by COGSA's one year statute of limitation. *See* 46 U.S.C. § 1303(6).

Obviously, the cross–claim is a speedy and more convenient manner of disposing of the various claims. The very purpose of Rule 13 of the Federal Rules of Civil Procedure allowing cross–claims is "to avoid multiple suits and to encourage the determination of the entire controversy among the parties before the court with a minimum of procedural steps." 6 Wright & Miller § 1431 (1971). The district court was correct in allowing the cross–claim in this particular instance.

## BLASSER BROTHERS' CROSS–APPEAL

Blasser Brothers' cross–appeal seeks an award of all costs against Continental rather than merely taxable costs, as the district court allowed. Blasser Brothers contends that two paragraphs in the insurance policy require the awarding of all costs to the insured. Blasser Brothers contends that paragraph 35,[15] which deals with Continental's option to advance the loss as a loan, requires the payment of all costs. Blasser Brothers also cites to paragraph 37 [16] in-

---

**15.** Paragraph 35 of the insurance policy reads as follows:

COMPANY'S OPTION TO ADVANCE LOSS: This company shall at its option have the right of advancing to the Assured the amount of the loss (otherwise recoverable hereunder) as a loan without interest pending a determination of Carrier's or Bailee's liability; the Company further agrees to bear all the expenses of any suit brought in the name of the Assured or of the owners of the insured merchandise, or otherwise to enforce the liability of the Carrier or Bailee. The repayment of the loan to the Company is conditional upon, and only to the extent of, any net recovery from the Carrier or Bailee received by the Assured or owner of the insured merchandise.

**16.** Paragraph 37 of the insurance policy reads as follows:

SUE AND LABOR: In case of any loss or misfortune, it shall be lawful and necessary to and for the Assured, his or their factors, servants and assigns, to sue, labor and travel for, in and about the defense, safeguard and recovery of the goods and merchandise, or any part thereof, without prejudice to this insurance; nor shall the acts of the Assured or this Company, in recovering, saving and preserving the property insured, in case of disaster, be considered a waiver or an acceptance of abandonment. The reasonable expenses so incurred shall be borne by the Assured and the Company in proportion as the sum hereby insured bears to the whole value at risk.

volving the sue and labor provisions for the defense, safety and recovery of the goods and merchandise.

Paragraph 35 is totally inapplicable, since it concerns the institution of a suit brought by the insured following the advancing of the loan by the insurance company. As discussed previously, Continental never advanced any money. Since the option was never exercised, the provisions of paragraph 35 are not relevant to this case.

Blasser Brothers' argument regarding the sue and labor provision in paragraph 37 is equally unavailing. An insured has the duty to exercise the care of a prudent, uninsured owner to protect insured property so as to minimize or prevent the loss for which the insurer would be liable. The purpose of the sue and labor clause is to reimburse the insured for those expenditures which are made primarily for the benefit of the insurer to reduce or eliminate a covered loss. *Continental Food Products, Inc. v. Insurance Co. of North America*, 544 F.2d 834, 837 n.1 (5th Cir. 1977), *citing, Reliance Insurance Co. v. The Escapade*, 280 F.2d 482, 488–89 (5th Cir. 1960). Sue and labor expenses are sums spent by the insured in an effort to mitigate damages and loss. *Seaboard Shipping Corp. v. Jocharanne Tugboat Corp.*, 461 F.2d 500, 503 (2nd Cir. 1972). Such expenses can include salvage operations and removal of cargo to safekeeping.

Expenses under a sue and labor clause do not include those which are exhausted in litigation against the insurer itself. Any action which Blasser Brothers took to preserve the cargo or mitigate damages would clearly be includible. Impex Colonial made a creditable attempt to salvage what it could. No evidence of the cost of these activities was presented, though,

and the court's award of taxable costs seems to amount to a sufficient sum to reimburse Impex for such actions. This court does not find the district court's decision on this matter clearly erroneous.

## ATTORNEYS' FEES

Blasser Brothers also is seeking an award of attorneys' fees incurred for work expended in the preparation and presentation of the present appeal. Under Florida law, an insured who prevails against an insurer is entitled to reasonable attorneys' fees on appeal. Fla.Stat.Ann. § 627.428(1) (West 1972). This right to attorneys' fees is applicable in federal courts sitting in Florida. *See North American Life & Casualty Co. v. Wolter*, 593 F.2d 609, 611 (5th Cir. 1979); *Meeks v. State Farm Mutual Automobile Insurance Co.*, 460 F.2d 776, 781 (5th Cir. 1972); *Coblentz v. American Surety Co. of New York*, 421 F.2d 187, 188 (5th Cir. 1969).

The applicable statute, however, is a procedural one, and the parties must satisfy the statutory requirements. Under Fla. Stat.Ann. § 59.46(2) (West Supp.1980),[17] when attorneys' fees are allowable by law on appeal, the requesting party must file a motion for attorneys' fees with the clerk of the appellate court "at or before the time of filing the party's first brief."

In the present case, Blasser Brothers filed its first brief on June 11, 1979. No request for attorneys' fees was proffered at that time. On April 30, 1980, Blasser Brothers filed its motion for attorneys' fees. Under Florida law, such a motion is not timely and will not be countenanced by an appellate court. For the above reason, attorneys' fees will not be granted on appeal.[18]

**17.** Section 59.46(2) of the Florida Insurance Code reads:

(2) When attorney's fees are allowable by law for services in the appellate court, the request therefor shall be presented by motion filed with the clerk of the appellate court at or before the time of filing the party's first brief. The motion for attorney's fees shall not be incorporated in the briefs or other bound papers, but shall be filed on a separate paper. The assessment of attorney's fees may be remanded to the trial court.

**18.** Blasser Brothers was awarded attorneys' fees in the amount of $10,000 by the district court.

## CONCLUSION

In the instant case, the court finds that Blasser Brothers did meet its prima facie burden, which was not rebutted by NOPAL. The court also finds that Continental had a right to cross–claim against and recover from NOPAL. Further, the award of taxable costs by the district court was correct. Finally, Blasser Brothers is not entitled to an award of attorneys' fees on appeal due to the untimeliness of its request.

AFFIRMED; Motion for Attorneys' Fees on Appeal DENIED.