**SONY MAGNETIC PRODUCTS, INC. OF AMERICA, Plaintiff,**

v.

**MERIVIENTI O/Y, a corporation, d/b/a Finnlines, Ltd; Enso Gutzeit O/Y, a corporation; O/Y Finnlines, Ltd., a corporation; Atlantic Cargo Services, a corporation; and M/V Finnhawk, her engines, hull, tackle, appertunances, etc., in rem, Defendants.**

No. 83–1048–C.

United States District Court,
S.D. Alabama.

Sept. 8, 1987.

Thomas S. Rue, Johnstone, Adams, Howard, Bailey & Gordon, Mobile, Ala., for plaintiff.

Sidney H. Schell, David M. O'Brien, Reams, Vollmer, Philips, Killion, Brooks & Schell, P.C., Mobile, Ala., for defendants.

## MEMORANDUM OPINION

EMMETT RIPLEY COX, District Judge:

### I. INTRODUCTION

Plaintiff Sony Magnetic Products, Inc. of America filed this action within the admiralty and maritime jurisdiction of the court alleging that the acts or omissions of one or all of the several defendants caused damage to plaintiff's videocassettes. Although plaintiff seeks recovery under breach of contract and negligence theories, all parties agree, and the court concludes, that the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. § 1300–1315, governs this action. Section 1302 of COGSA provides:

> Subject to the provisions of section 1306 of this title, under every contract of carriage of goods by sea, the carrier in relation to the *loading, handling,* stowage, carriage, custody, care and discharge of such goods, shall be subject to the responsibilities and liabilities and entitled to the rights and immunities set forth in sections 1303 and 1304 of this title (emphasis added).

Defendants contend that they are absolutely exempt from liability because plaintiff's loss was attributable to one or more of the statutory exceptions to COGSA liability.[1] Alternatively, defendants contend that plaintiff's damages should be limited by the "package limitation" defense of § 1304(5),[2] and that plaintiff's recovery should be limited by its failure to mitigate damages.

The court has subject matter jurisdiction over this action under 28 U.S.C. § 1333, and no defendant contests the court's *in personam* jurisdiction over it. The matter was tried before the court, and the court enters the following findings of fact and conclusions of law.

### II. FINDINGS OF FACT

1. Plaintiff Sony Magnetic Products, Inc. of America is and was at all material times a corporation incorporated under the laws of a state of the United States, and was at all material times qualified to do business in the State of Alabama. Defendant Merivienti O/Y, a corporation d/b/a Finlines, Ltd., is and was at all material times an operator of oceangoing vessels, and was at all material times the manager of the M/V FINNHAWK, a merchant vessel engaged in business as a common carrier for hire between various ports worldwide, including Mobile, Alabama. Defendant Enso Gutzeit O/Y, a corporation, is and was at all material times an operator of oceangoing vessels, and was at all material times the owner of the M/V FINNHAWK and other merchant vessels. Defendant O/Y Finnlines, Ltd., a corporation, is and was at all material times an operator of oceangoing vessels, and was at all material times the owner of the M/V FINNHAWK and other merchant vessels. Defendant Atlantic Cargo Services, a corporation, is and was at all material times an operator of oceangoing vessels, and was at all material times the charterer and operator of the M/V FINNHAWK and other merchant vessels. Defendant M/V FINNHAWK is sued *in rem.*

---

1. The statutory exceptions to COGSA liability are listed in 46 U.S.C. § 1304(2). Defendants seeks the protection of three of the exceptions: insufficiency of packing (§ 1304(2)(n)); latent defects not discoverable by due diligence (§ 1304(2)(p)); and "any other cause arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier...." (§ 1304(2)(q)).

2. 46 U.S.C. § 1304(5) provides, in pertinent part:

> Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package lawful money of the United States, or in case of goods not shipped in packages, per customary freight unit, or the equivalent of that sum in other currency, unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading.

2. On or just prior to March 2, 1982, an agent and employee of plaintiff contacted an agent and employee of Page & Jones, Inc., a freight forwarder with offices in Mobile, Alabama, for the purpose of arranging to have Page & Jones book space on an oceangoing vessel for the transport of plaintiff's videocassettes to Felixstowe, England. Page & Jones was plaintiff's regular freight forwarder at the time, and plaintiff had been shipping about 15–20 containers of cargo per month through its office. Page & Jones made a "space booking" with Gas & Equipment Transport, Inc., a non-vessel operating common carrier. Gas & Equipment (G & E), in turn, booked space with defendant Atlantic Cargo Services (ACS), as evidenced by the "contract of affreightment" entered into between G & E as "shipper" and ACS (Pl. Exh. # 23). The contract provides, *inter alia:*

We confirm engagement of freight space for:

1 × 40 HH Magnetic Tapes

The court finds as a fact that the limited purpose of this designation was to reserve shipboard space with ACS for a container of plaintiff's tapes.

3. On March 18, 1982, a "load sheet" (Pl. Exh. # 5) was prepared by plaintiff's shipping supervisor indicating that 46,368 LS–435 videocassette tapes (forty pallets, each pallet containing twenty-four cartons, and six extra cartons), and 16,992 L–830E videocassette tapes (eleven pallets each, containing thirty cartons, and twenty-four extra cartons), were loaded into container No. ICSU–2265763 at plaintiff's facility in Dothan, Alabama. Six cartons of LS–435 tapes and twenty-four cartons of L–830E tapes were consolidated onto one pallet. The LS–435 tapes were packaged as follows: six cassettes were placed in a cloth bag, and four bags were then placed in a cardboard subcarton with foam spacers between each bag. Two subcartons were then placed in a cardboard master carton. Twenty-four master cartons were then placed on a wooden pallet (two cartons deep, three cartons wide, and four cartons high), and a single piece of cardboard was placed atop the stacked cartons. The

stacks were secured to the pallets by means of a metal strip vertically encircling each of the two outside columns of cartons (two deep and four high). (See Pl. Exh. # 9–N, # 9–O, and # 9–Q). The L–830–E tapes were packaged as follows: each cassette was placed in a "fancy case" of cardboard and wrapped in cellophane (See Pl. Exh. # 1). Twelve cassettes were then placed in a cardboard subcarton, and four subcartons were then placed in a cardboard master carton. Thirty master cartons were then placed on a wooden pallet (two cartons deep, three cartons wide, and five cartons high), and a single piece of cardboard was placed atop the stack of cartons. The stacks were secured to the pallets by means of a metal strip vertically encircling each of the two outside columns of cartons (two deep and five high). (See pallets in background of Pl. Exh. # 9–Q). The weight of the loaded containers, as reflected on the "load sheet" and the invoice (Pl. Exh. # 7), was well within the weight limit specified by Gas & Equipment.

4. On March 18, 1982, plaintiff delivered to Strachan Shipping Company, as agent for ACS, at Pier 8 of the Alabama State Docks, 1,320 cartons of plaintiff's videocassettes on fifty-two pallets, in good order and condition. At or about the time the container was delivered to the dock, G & E issued to plaintiff a bill of lading (Pl. Exh. # 22) and an attached export declaration (Pl. Exh. # 20), both of which were prepared by Page & Jones for G & E. The bill of lading does not on its face reserve a space specifically for designating the value of cargo, but the value of plaintiff's cargo in this case is reflected on the export certificate as $424,765.00. The court is unable to determine from the record in this case whether any of the defendants knew or should have known of the value of the cargo.

The G & E bill of lading contains the following clause (see Pl. Exh. # 22, para. 29):

In case of any loss or damage to or in connection with Goods exceeding in actual value the equivalent of $500 lawful money of the United States per package

or in case of Goods not shipped in packages per shipping unit, the value of the Goods shall be deemed to be $500 per package or per shipping unit. The Carrier's liability, if any, shall be determined on the basis a value (sic) of $500 per package or per shipping unit or pro rata in case of partial loss or damage, unless the nature of the Goods and a valuation higher than $500 per package or per shipping unit shall have been *declared by the Shipper before shipment and inserted in this Bill of Lading...*

5. On or about March 26, 1982, as the M/V FINNHAWK'S deck crane was lifting the container of plaintiff's cassettes to the vessel's container deck, the hydraulic motor of the crane failed catastrophically, allowing the winch drum to freewheel and the container to plummet some sixty feet to the concrete loading apron below. The catastrophic failure of the crane was the direct cause of the damage to plaintiff's videocassettes for which plaintiff seeks recovery.

6. Three experts testified at trial as to the probable cause of the explosion of the hydraulic motor which precipitated the catastrophic failure. All experts agreed that the immediate cause of the catastrophe was that one of the seven piston ball heads in the cylinder-and-piston assembly of the motor sheared off and jammed between the cylinder housing and the wobble plate. Despite continued hydraulic pressure, the cylinder and wobble plate assemblies stopped turning, and the hydraulic pressure ultimately fractured the motor housing. The experts disagreed, however, as to why the piston ball head sheared off. One of defendants' experts, a metallurgist, opined that microscopic cracks in the piston created during the manufacturing process were aggravated by fatigue, and ultimately precipitated the shearing off of the piston ball head. The other expert propounded by defendant, a marine surveyor, testified that he reviewed the crane's inspection certificates, and that the quadrennial inspection certificate dated February 2, 1982 (Defs. Exh. 4), indicated that all safety systems on the crane were operating properly. He also testified that, *assuming* there were no

previous problems with the motor, the failure must have been caused by latent defects created during the manufacturing process.

Plaintiff's expert opined that the failure was caused as follows: a disfunctional hookstop limit switch allowed the tackle on the crane's cable to jam into the end of the boom, causing the winch drum and the wobble plate (the "driven" end of the crane's motor and transmission assembly) to stop abruptly. Driven by hydraulic pressure, the piston assembly continued its rotary inertia, creating an extraordinary dynamic load which sheared off the piston head. According to plaintiff's expert, the most telling indicia of the correctness of his theory was the twisting of splines on the wobble plate shaft, which twisting he opined could not have occurred but for the dynamic force created by continuous hydraulic pressure attempting to rotate a jammed wobble plate assembly.

The court is convinced that plaintiff's expert presented the more credible explanation of the catastrophic motor failure, and is unable to find as a fact that the failure was caused, either directly or proximately, by fatigue cracks or cracks created during the process of manufacturing the pistons. Particularly significant to the court's conclusion is the twisting of the wobble plate splines, which the court finds unlikely to have occurred under the scenario presented by defendants' expert. The court finds the testimony of the longshoreman who operated the crane at the time of the failure, that he operated the crane properly, insufficient to rebut the implication in the theory of plaintiff's expert that the cable tackle was jammed into the boom.

Defendants' evidence suggesting that the crane was properly maintained at all pertinent times is inconclusive. The safety and inspection test certificates for the crane (Defs. Exhs. # 4, # 4A, # 4B and 16), and the crane's log book, are written in a foreign language unintelligible to the court, and the relevance of the documents to the particular factual questions at issue (e.g., the functioning of the limit switch) is not made clear by the testimony adduced at

trial. All crewmembers agreed, and the court finds as a fact, that regular maintenance records for the crane were not kept. Although crewmembers charged with maintenance of the crane were aware of problems with the hookstop limit switch, problems associated with exposure to salt water and infrequent use of the crane, the court is unable to find that they took the steps necessary to insure its proper operation on the occasion of the accident which caused plaintiff's loss. The fact that the disfunctioning of the limit switch may have been caused by exposure to salt walter or lack of use rebuts the inference raised by the testimony of defendants' marine surveyor that because the switch was working when inspected on February 16, it necessarily must have been working at the time of the failure on or about March 26, 1982. Finally, the court is not persuaded by the circular argument of defendants' marine surveyor that, assuming there were no other problems with the motor, the failure *must* have been caused by a latent defect.

7. Shortly after the accident, plaintiff filed a declaration of loss with its cargo underwriter (Pl. Exh. # 3). The applicable contract of insurance between plaintiff and the underwriter contained a "Brand and Label Clause" (Pl. Exh. # 4) which provided that, in the event any salvage operation was undertaken, "the salvage value of such damaged property shall be determined after the removal of all Brands, Trade Marks or Labels and after the property has been stamped and/or marked 'Salvage'."

On April 6, 1982, the damaged cargo was inspected in a warehouse at the Alabama State Docks by representatives of plaintiff, defendants, and plaintiff's underwriter. At the behest of plaintiff's representative, a number of cassettes from cartons which showed no apparent damage was examined, and the court finds as a fact that all or substantially all of the examined cassettes displayed evidence of damage sufficient to render them unmarketable as new merchandise. Shortly after this inspection plaintiff decided to negotiate for the salvage of the cassettes.

Plaintiff's L–830E tapes, which are marketed in an unrecorded state directly to the consumer, have the SONY trade mark embossed into the plastic at the bottom right-hand corner of the underside of the cassette. Also, "S.M.P.A. Inc." (standing for Sony Magnetic Products of America, Inc.) is embossed on the underside of both the L–830E and the LS–435 cassettes beneath the retainer lid. The SONY trademark is *not* embossed on the LS–435 cassettes.

Salvage negotiations were unsuccessful, because plaintiff refused to allow the cassettes to be marketed as "seconds" with only a nonwarranty sticker on them and without removal of the embossed marks identifying the cassettes as plaintiff's products. Plaintiff was offered $85,000–$90,000 for the tapes to be marketed with nonwarranty stickers and without removal of the embossed markings. Plaintiff ultimately purchased the damaged cargo from its underwriter for $65,000, and destroyed the cassettes. There was no evidence, however, that this payment from plaintiff represented the salvage value of the cassettes.

On August 30, 1982, after the cassettes were returned to plaintiff's Dothan, Alabama facility, tests were run by plaintiff's personnel on cassettes taken from cartons which showed no apparent damage, with representatives of the cargo underwriter present. All or substantially all of the cassettes tested fell below the manufacturer's performance specifications, and were therefore unmarketable as new merchandise.

The cassettes which were damaged, when marketed new, carry as a matter of fact a lifetime warranty which entitles the purchaser to return a unit for a new one if it ceases to function properly for any reason, whether or not caused by the fault of the purchaser.

8. The purchase price of the shipment as reflected in plaintiff's invoice to Sony Overseas, S.A. (Pl. Exh. # 7) was $424,765.44. (See also, Pl. Exh. # 20). The court finds as a fact that the actual damage suffered by plaintiff was $424,765.44.

## III. CONCLUSIONS OF LAW

■ 1. Section 1303 of Title 46 provides in pertinent part:

(2) The carrier shall properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried.

The parties have stipulated that each and every one of the corporate defendants is a "carrier" as that term is defined in 46 U.S.C. § 1301(a). Since plaintiff's cassettes were delivered to the custody of the defendants in good order and condition, and were returned to plaintiff in a damaged condition, the court concludes that plaintiff has established a prima facie case for recovery under COGSA. Accord, *Terman Foods, Inc. v. Omega Lines*, 707 F.2d 1225 (11th Cir.1983); *Blasser Bros., Inc. v. Northern Pan-American Line*, 628 F.2d 376 (5th Cir.1980); *Socony Mobil Oil Co., Inc. v. Texas Coastal and International, Inc.*, 559 F.2d 1008 (5th Cir.1977).

■ The Eleventh Circuit stated in *Terman Foods*, 707 F.2d at 1227:

"Once the shipper presents a prima facie case, the burden shifts to the carrier to prove either that it exercised due diligence to prevent the damage by properly handling, stowing, and caring for the cargo in a seaworthy ship, 46 U.S.C.A. §§ 1303(1) and (2), or that the harm resulted from one of the excepted causes listed in 46 U.S.C.A. § 1304(2)." (Citations omitted).

Defendants do not contend that they exercised due diligence in the loading of the cargo, and the court makes no finding in that respect. Rather, defendants contend that one or more of the statutory exceptions under 46 U.S.C. § 1304(2) obviates them from liability in this case. The court concludes that the defendants bear the burden of proving the applicability of the statutory exceptions. *M. Golodetz Export Corp. v. S/S Lake Anja*, 751 F.2d 1103 (2d Cir.), cert. denied, 471 U.S. 1117, 105 S.Ct. 2361, 86 L.Ed.2d 261 (1985); 46 U.S.C. § 1304(2)(q). The court is also of the opinion that defendant must prove that the loss is attributable solely to the fault of plaintiff, at least to the extent necessary to rebut plaintiff's prima facie case.[3]

■ 2. Assigning the burden of proof with respect to the "package limitation" defense under 46 U.S.C. § 1304(5) is a more troubling issue. The package limitation defense involves resolution of two independent questions. First, the court must determine whether "the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading." Second, the court must determine what the "package" is in this case for purposes of the $500 per package limitation of liability under Section 1304(5).

3. Under 46 U.S.C. § 1304(5), the carrier can limit its liability only if it gives the shipper a "fair opportunity" to declare a higher value for the goods to be shipped. *Komatsu, Ltd. v. States S.S. Co.*, 674 F.2d 806, 809 (9th Cir.1982) (citations omitted). Although the carrier has the initial burden of establishing that such fair opportunity existed, "[e]xpress recitation in a bill of lading of the language contained in [46 U.S.C. § 1304(5)] is prima facie evidence that the carrier gave the shipper that opportunity and places the burden on the shipper to prove that such an opportunity did not exist in fact." *Id.* (citations omitted); *Brown & Root, Inc. v. M/V PEISANDER*, 648 F.2d 415, 424 (5th Cir.1981).[4]

---

**3.** As the court of appeals stated in *Terman Foods*, 707 F.2d 1227:

Only if the carrier is able to rebut the [plaintiff's] prima facie case by proving that it falls within one of the exceptions does the burden of proof then shift back to the [plaintiff] to show that the carrier's negligence was, at least, a concurrent cause of the loss.

**4.** This is not a case in which the bill of lading contained only a "paramount clause" stating that all of COGSA's requirements were incorporated into the bill, or a clause making only

specific reference to 46 U.S.C. § 1304(5), statements which the *Komatsu* court held did *not* discharge the carrier's prima facie burden of showing that a fair opportunity to declare a higher value existed. See also, *Pan American World Airways, Inc. v. California Stevedore and Ballast Company*, 559 F.2d 1173, 1177 (9th Cir. 1977). But see, *Brown & Root*, supra, at 424, which states in dicta that a "paramount clause" in a bill of lading, coupled with an import tariff which provides the shipper an opportunity to declare a higher value, is sufficient to discharge the carrier's prima facie burden.

The G & E bill of lading included the requisite recitation (see Finding of Fact No. 4, supra), and it is therefore the plaintiff's burden to prove that a fair opportunity to declare a higher value did not exist.

Plaintiff argues that a fair opportunity to declare a higher value "must be present on the face of the bill of lading to constitute prima facie evidence that the shipper has been given a fair opportunity to declare a higher value." Although plaintiff is not specific on the point, the court assumes plaintiff's argument to be that the face of the bill of lading must contain a space expressly reserved for the higher value declaration. The cases are in disagreement as to whether such a requirement exists under COGSA. *Komatsu* and *Pan Am.*, supra, agree with plaintiff that the face of the bill of lading must reserve a space for the higher value declaration. To the contrary, *Brown & Root*, supra, states:

> "COGSA § 4(5) does *not* prescribe that the face of the bill of lading contain a specific space or blank in which the increased valuation is to be inserted nor does it provide that the carrier rather than the shipper must make the notation. The phrase 'unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading' clearly puts the burden on the shipper to make the determination as between value limitations and the making of the declaration. See W. TETLEY, MARINE CARGO CLAIMS 442 (2d. Ed.1978). Indeed, the stipulated bill of lading leaves ample space in the middle of the front page for 'Description of Packages and Goods' under the heading 'Particulars Furnished by Shipper.'" *Id.* at 424.

■ The court concludes that *Brown & Root* provides the better rule. The court is sympathetic to plaintiff's economic motiva-

tion for not declaring the higher value on the face of the bill of lading,[5] but the price of acquiring this advantage is that the Section 1304(5) package limitation will apply. The court is unwilling to entertain the fiction suggested by the opinions in *Komatsu* and *Pan Am* that a sophisticated commercial party and experienced shipper such as plaintiff in this case cannot be deemed to have knowledge of Section 1304(5), especially when, as here, the provisions thereof are recited almost verbatim on the reverse side of the bill of lading. When the declaration is not made on the face of the bill, it is the shipper, not the carrier, which benefits from lower freight rates; it is only fair, then, that the shipper, and not the carrier, should bear the costs of nondeclaration.

■ Plaintiff also urges the court to find that it "constructively declared" a higher value by attaching to the bill of lading an export declaration which stated on its face the exact value of the cargo. Plaintiff cites no authority, and the court has found none, which supports the proposition that such a constructive declaration avails against failure to declare the higher value on the bill of lading despite a fair opportunity to do so, especially in the absence of any evidence that defendants actually knew of the value as stated on the export declaration.

The court concludes that plaintiff has not sustained its burden of proving that it declared a higher value within the meaning of Section 1304(5). Therefore, the court concludes that the $500 per package limitation of liability of that section applies to this case.

■ 5. Defendants argue that each of the fifty-two pallets in this case was a COGSA "package," relying heavily on *Hayes-Leger Associates, Inc. v. M/V Oriental Knight*, 765 F.2d 1076 (11th Cir.

---

**5.** A declaration of higher value will shift the responsibility for loss from the shipper's cargo underwriter to the carrier under COGSA, but will also result in higher freight rates. The decision shippers must make is whether the increase in freight rates will result in a commensurate decrease in premiums it pays for its cargo insurance. Accord, *Cameco, Inc. v. S.S.*

*American Legion*, 514 F.2d 1291, 1300 (2d Cir. 1974). This dilemma was implicitly suggested by the agent of plaintiff's freight forwarder in his testimony that shippers rarely, if ever, declare a higher value. However, the court need not address in this case whether the law should sanction the practice.

1985).[6] Plaintiff, on the other hand, argues that each of the 1,320 cartons of cassettes was a COGSA package, relying on *Vegas v. Compania Anonima Venezolana De Navegacion,* 720 F.2d 629 (11th Cir.1983), and *Allstate Ins. Co. v. Inversiones Navieras Imparca,* 646 F.2d 169 (5th Cir. Unit B 1981) as authority for its position. Having reviewed the cases cited by the parties and the balance of the jurisprudence treating the issue, the court concludes that each of the 1,320 cartons of cassettes was a COGSA "package."

*Hayes-Leger* is factually inapposite to the present case. Four of the five bills of lading at issue in that case contained inaccurate descriptions of the *number* of units in the metal shipping containers.[7] In the last of the five bills of lading, the "No. of Pkgs." column listed "One Container Only," and the goods were described in the "Description of Packages and Goods Column" as "1 Container Said to Contain: 3,542 Pcs. Woven Baskets and Rattan Furniture." Relying upon *Binladen BSB Landscaping v. M/V "Nedlloyd Rotterdam",* 759 F.2d 1006 (2d Cir.1985), the court held that "the shipment must be treated as one of 'goods not shipped in packages'," and remanded the case for a determination of the "customary freight unit"[8] for such shipments. The reason for the holding is contained in the following footnote:

> The bill of lading described the goods as "3,542 PCS." of baskets and furniture. This description was insufficient to indicate to the carrier that the goods were "packaged." As the Second Circuit explained in *Binladen BSB Landscaping,* if the shipper intends to rely on the description portion of the bill of lading to disclose to the carrier the number of COGSA "packages" in a container, *that*

description must indicate "the number of items qualifying as packages (i.e., connoting preparation in some way for transport), such as 'bundles,' 'cartons,' or the like."* Id. at 1013–14.

*Hayes-Leger,* supra, at 1081 fn. 9 (emphasis supplied). Not only are *Hayes-Leger* and the instant case factually distinguishable, but the reasoning of *Hayes-Leger,* especially footnote 9 of the opinion, actually *supports* the plaintiff's position in this case.

In contrast to *Hayes-Leger,* the facts in *Vegas,* supra, are strongly analogous to the facts of this case. There, the shipper wrote "2" in the "No. of Pkgs." column on the bill of lading, and wrote "Palletized master cartons, STC: 109 cartons: auto brake parts" in the "Shipper's Description of Packages and Goods" column. Relying upon *Allstate,* supra, the *Vegas* court held that each of the 109 cartons of brake parts was a COGSA package. A portion of the reasoning in *Vegas* deserves quoting in full:

> Two factors significantly influence our decision. First, in *Allstate* we followed the second circuit's decision in *Mitsui & Co. v. American Export Lines, Inc.,* 636 F.2d 807 (2nd Cir.1981). In that case the court opined that the goal of international uniformity would be better served if the COGSA provisions were construed in harmony with the 1968 Brussels Protocol to which the United States is a party. The effect of the protocol was described in *Mitsui* as follows:
>
> > Where a container, *pallet* or similar "article of transport" is used to consolidate goods, *the number of packages or units enumerated in the bill of lading as packed in such articles of transport shall be deemed to be the*

---

**6.** Defendants also suggested, albeit equivocally, that the single metal shipping container might be the COGSA "package," a proposition which has been firmly rejected by the jurisprudence, see, *Mitsui & Co., Ltd. v. American Export Lines,* 636 F.2d 807 (2d Cir.1981); *Hayes-Leger,* supra, at 1080, and which the court rejects here.

**7.** Agreed Fact (G) of the pretrial order states that there were 1,320 cartons of videocassettes in the container, which figure comports with

the figure on the ACS bill of lading (see Pl. Exh. 21).

**8.** 46 U.S.C. § 1304(5) provides that "in case of goods not shipped in packages," the damage limitation shall be $500 "per customary freight unit." There is no contention by defendants in this case that plaintiff's videocassettes were "goods not shipped in packages."

*number of packages or units; if, on the other hand, the bill of lading does not show how many separate packages there are, then each "article of transport" shall be deemed to be a package or unit.*

*Id.* at 821. *We take as significant the protocol's interchangeable use of the words "container, pallet, or similar 'article of transport'." Looking solely to this provision of the protocol we perceive no basis for any reasoned distinction between a container filled with individual listed packages or cartons and a palletized master carton similarly filled.*

\* \* \* \* \* \*

It is apparent to us that both the individual and the master cartons could fit within [the Webster's Third New International Dictionary (1966) definition of "package"]. Given the congressional purpose to limit agreements restricting carriers' liability, however, we doubt justification exists for restricting liability on the basis of consolidation into master cartons of packages to each of which, except for such consolidation, the five hundred dollar limitation would apply.

*Id.* at 631 (emphasis supplied). It is clear that the last sentence would also apply where, as in the instant case, cartons are consolidated onto pallets.[9]

The conclusion reached by the court in this case is further supported by jurisprudence which defers to the designation on the bills of lading as to the number of "packages" being shipped. See, e.g., *Marcraft Clothes, Inc. v. M/V Kurobe Maru,* 575 F.Supp. 239 (S.D.N.Y.1983) (each of 4,400 suits draped only in plastic bags considered COGSA package where number disclosed on face of bill of lading); *Allied Chemical v. Companhia de Navegacao,* 775 F.2d 476 (2d Cir.1985) (where bill of lading disclosed both number of pallets and total number of cartons palletized, district court was not clearly erroneous in finding that each of the cartons was a COGSA "package").

6. Defendants contend that plaintiff's loss was attributable to one or more of the statutory exceptions to carrier liability listed in 46 U.S.C. § 1304(2). Insufficiency of packing under section 1304(2)(n) is a factual issue, and whether damage to cargo is attributable to insufficient packing must be decided on a case-by-case basis. *Internatio, Inc. v. M/V Yinka Folawiyo,* 480 F.Supp. 1245 (E.D.Pa.1979). The court concludes that defendants have not sustained their burden of proving that insufficient packing was the cause of plaintiff's loss. (See, Finding of Fact No. 3, supra.)

Likewise, the court concludes that defendants have not sustained their burden of proving that the cause of plaintiff's loss was a latent defect within the meaning of § 1304(2)(p). A latent defect is a defect which is not apparent and which would not be discoverable upon reasonable inspection, *Bubble Up International Ltd. v. Transpacific Carriers Corp.,* 458 F.Supp. 1100 (S.D.N.Y.1978), or which could not be discovered by any known and customary test. *Waterman Steamship Corp. v. United States S.R. & M. Company,* 155 F.2d 687 (5th Cir.1946). On the basis of the testimony of defendants' expert, the court is unable to conclude that cracks in the pistons created by the improper manufacture thereof were directly or proximately responsible for the catastrophic failure of the crane motor. Since defendants bear the burden of proving the applicability of the latent defects exception, the court need not determine whether plaintiff's expert definitively and conclusively explained the cause of the catastrophic motor failure.

Finally, the court concludes that defendants have not sustained their burden of proving that plaintiff's loss was attributable to "any other cause arising without the actual fault and privity of the carrier" under § 1304(2)(q). Defendants do not suggest what such a cause might be, and there is nothing in the record to suggest the existence of such a cause.

**9.** *Vegas* has been followed by district courts in this circuit. See, e.g., *Inter-Ocean (Free Zone),* *Inc. v. Manaure Lines, Inc.,* 615 F.Supp. 710 (S.D.Fla.1985).

■ 7. Defendants contend that plaintiff failed to mitigate its damages, a contention which defendants bear the burden of proving. *Emmco Insurance Co. v. Wallenius Caribbean Line S.A.*, 492 F.2d 508 (5th Cir.1974); *Compagnie De Navigation Fraissinet & Cyprien Fabre, S.A. v. Mondial United Corp.*, 316 F.2d 163 (5th Cir.1963); *Dixie Plywood Co. v. S.S. Federal Lakes*, 404 F.Supp. 461 (S.D.Ga.), aff'd, 525 F.2d 691 (5th Cir.1975), cert. denied, 425 U.S. 974, 96 S.Ct. 2174, 48 L.Ed.2d 798 (1976). Plaintiff's duty in this respect is to minimize damages which can be avoided by reasonable effort. *Amstar Corp. v. M/V Alexandros T.*, 472 F.Supp. 1289 (D.Md.1979) (citing *Compagnie De Navigation,* supra). Defendants contend that it was unreasonable for plaintiff to insist that the embossed markings be removed, and that plaintiff should have allowed the cassettes to be marketed under a nonwarranty sticker. This argument is not persuasive. The court is convinced that as a matter of public policy a manufacturer which has spent years and millions of dollars developing a reputation in the marketplace should not be required to jeopardize that reputation under circumstances such as those with which the court is presented in this case. Although it is arguable that the LS–435 cassettes, with only "S.M.P.A. Inc." embossed on them, would not be as immediately recognized as plaintiff's product as would the L–830E cassettes, with "SONY" embossed on them, the court is unwilling to find unreasonable plaintiff's conclusion that its market reputation might be jeopardized by circulation of any of the damaged cassettes.

■ The court also rejects defendants' contention that plaintiff did not take reasonable steps to remove undamaged cassettes or parts thereof. The shipment in this case consisted of 63,360 cassettes. The evidence clearly indicates that plaintiff chose a representative sample of the cas-settes to estimate the probable damage to the whole shipment,[10] a method which has been recognized and approved. See *Compagnie De Navigation,* supra, at 171. Defendants cite no authority for the proposition that plaintiff was required to incur the enormous expense of individually examining each cassette, and it is a requirement which the court is unwilling to impose.

■ 8. The court concludes that the appropriate measure of damages in this case is the invoice value of the cassettes, *Emmco Insurance Co.,* supra, at 514, unless the defendants can establish that some of the cargo was not damaged. *Blasser Bros.,* supra, at 382; *Insurance Company of North America v. Dart Containerline Co., Ltd.,* 629 F.Supp. 781 (E.D.Va.1985). The court concludes that defendants have not sustained their burden of proving that the cargo of plaintiff's cassettes was not a total loss. Accordingly, the court concludes that the amount of damages to which plaintiff is entitled is $424,765.44. Moreover, the court concludes that plaintiff is entitled to prejudgment interest at the rate of 9%[11] calculated from April 15, 1982, the date upon which the cassettes in this case were to be delivered. See *Mitsui & Company, Ltd.,* supra, at 824.

The court will by separate document enter final judgment in accordance with this opinion.

---

10. Indeed, the evidence suggests that if the sample was *not* representative, it favored the *defendants,* not plaintiff.

11. The court has averaged the "equivalent coupon issue yield" on 52–week Treasury bills from April 15, 1982, to the present, and that average is 9.004%, an incremental variance from the prejudgment interest rate requested by plaintiff. See, *Columbia Brick Works, Inc. v. Royal Insurance Co. of America,* 768 F.2d 1066 (9th Cir. 1985).