790 F.2d 1209
 SHELL OIL COMPANY, and Pecten Oil Trading Company,
Plaintiffs-Appellees,
v.
M/T GILDA, Her Engines, Tackle, Apparel, Furniture, Etc., Defendants,
West of England Ship Owners Mutual Protection and Indemnity
Association (Luxembourg), Defendant-Appellant,
and
TOTAL COMPAGNIE FRANCAISE DE NAVIGATION, Defendant-Third
Party Plaintiff-Appellant,
v.
HOLBORN OIL TRADING LIMITED, Third Party Defendant-Appellee.
 No. 84-3890.
 United States Court of Appeals,
Fifth Circuit.
 June 2, 1986.
 
 Robert B. Deane, Chaffe, McCall, Phillips, Toler & Sarpy, Harvey G. Gleason, J. Francois Allain, Kenneth J. Servay, New Orleans, La., for third party defendant-appellee.
 Hugh Ramsay Straub, Terriberry, Carroll, Yancey & Farrell, Gary A. Hemphill, New Orleans, La., for plaintiffs-appellees.
 W.E. Noel, New Orleans, La., for Holborn Oil Trading Ltd.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 Before WISDOM, REAVLEY, and JOHNSON, Circuit Judges.
 WISDOM, Circuit Judge:
 
 
 1
 We review a judgment against the ship, the carrier, and the carrier's insurance company for failure of the carrier to deliver 12,068 barrels of crude oil to the owner of the cargo. We reverse the judgment in rem against the M/T GILDA for lack of jurisdiction over the vessel. In all other respects, we affirm the judgment of the district court.
 
 I.
 
 2
 Holborn Oil Trading, Ltd. purchased a quantity of GSM crude oil in August 1979.[1] Holborn chartered the French tanker M/T GILDA to ship the oil. The GILDA is owned and operated by the defendant Total Compagnie Francaise de Navigation (Total CFN or Total). The voyage charter party specifies that the carrier is not required to heat the cargo.
 
 
 3
 The GILDA proceeded to Ras Shukheir, Egypt, where the ship's officers refused to permit Holborn's surveyors to inspect the ship's cargo tanks for sludge and sediment. On September 8, 1979, the GILDA's master issued a clean bill of lading acknowledging receipt of 842,797 U.S. barrels of GSM crude oil. The GILDA left Ras Shukheir for Antwerp via the Cape of Good Hope.
 
 
 4
 While the GILDA was at sea, Holborn sold the cargo to Shell Oil Company through Shell's affiliate, Pecten Trading Company. Shell planned to transport the oil from its Capline facility in St. James, Louisiana, to the Wood River Refinery in Illinois through an unheated pipeline.
 
 
 5
 The GILDA altered course for St. James. Near Cayman Brac in the Caribbean, the GILDA reduced her draft by lightering 270,582 barrels of oil onto another vessel, the M/V FINA NORVEGE. The GILDA could not have proceeded directly to St. James because of her draft. During the lightering operation one of the GILDA's two main cargo pumps failed.
 
 
 6
 The GILDA proceeded up the Mississippi River to Shell's Capline Terminal in St. James. There she discharged another 560,001 barrels of oil using her one operable main cargo pump as well as two stripping pumps. The stripping pumps are designed to remove residues from the bottom of the cargo tanks. After the pumping operation was completed, the GILDA took on ballast by flooding her cargo tanks with river water and started down the Mississippi.
 
 
 7
 Because of pumping difficulties and the alleged incompetence of the crew, the full cargo was not discharged at St. James. Over 12,000 barrels of oil were still on board.[2] Shell reached officials of Total CFN who in turn ordered the GILDA to drop anchor at the mouth of the Mississippi. Surveyors representing both Shell and Total boarded the GILDA at Southwest Pass and measured 12,068 barrels of oil floating on top of the ballast water in the GILDA's cargo tanks. The surveyors found that all 12,068 barrels were liquid, pumpable crude oil.
 
 
 8
 The GILDA proceeded to Marseilles without discharging any additional oil. During the voyage, the crew washed the main cargo tanks with hot water. At Marseilles, Total Compagnie Francaise de Raffinage, the parent company of Total CFN, took delivery of about 15,000 barrels of oil and residues discharged from the GILDA's main cargo tanks and slop tanks.
 
 
 9
 Shell sued the GILDA, Total CFN, and Total's insuror, The West of England Ship Owners Mutual Protection & Indemnity Association. Shell did not effect service of process on the GILDA, however. Total CFN impleaded Holborn, alleging that Holborn supplied unsuitable oil. The district court conducted a trial and entered judgment against the GILDA, Total CFN, and The West of England for $435,219.00, the amount Shell paid Holborn for delivery of 12,068 barrels of GSM crude oil. Total CFN and The West of England appeal from the judgment.
 
 II.
 A.
 
 10
 The defendants first challenge the district court's conclusion that the contract of carriage is governed by the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. Secs. 1300-15. COGSA imposes a duty on carriers to "properly and carefully load, handle, stow, carry, keep, care for and discharge the goods carried". 46 U.S.C. Sec. 1303(2). COGSA applies by its own terms only if the bill of lading is the contract of carriage. 46 U.S.C. Sec. 1300. If the shipper charters the entire vessel, the charter party rather than the bill of lading is the contract of carriage unless the parties express an intent to the contrary. Nichimen Co. v. M/V Farland, 2 Cir.1972, 462 F.2d 319, 328. See generally Chiang, "The Characterization of a Vessel as a Common or Private Carrier", 48 Tul.L.Rev. 299 (1974). In this case Holborn chartered the entire vessel.
 
 
 11
 The parties may, however, incorporate by reference some or all of the provisions of COGSA in a contract of private carriage. Colgate Palmolive Co. v. S/S Dart Canada, 2 Cir.1983, 724 F.2d 313, 315. Because COGSA governs such cases only as a matter of contract, the Act applies only to the extent that the parties manifest an intent that it should apply. PPG Industries, Inc. v. Ashland Oil Co., 3 Cir.1975, 527 F.2d 502, 507.
 
 
 12
 The voyage charter party between Holborn and Total CFN includes the Clause Paramount. That Clause, set out in full in the margin, reflects the parties' intent to incorporate COGSA in its entirety.[3] The two cases Total cites do not support a contrary conclusion. The Marine Sulphur Queen, 2 Cir.1972, 460 F.2d 89, cert. denied, 409 U.S. 982, 93 S.Ct. 326, 34 L.Ed.2d 246; Pannell v. United States Lines Co., 2 Cir.1959, 263 F.2d 497, cert. denied, 359 U.S. 1013, 79 S.Ct. 1151, 3 L.Ed.2d 1037. In Marine Sulphur Queen the court, in refusing to apply the COGSA burden of proof, found only a limited, not a general incorporation of COGSA. In Pannell the court found a specific intent not to incorporate the COGSA definition of "package".
 
 B.
 
 13
 The cargo owner has the burden of proving that loss of the cargo was due to the carrier's fault, unless the parties to a contract for private carriage adopt some other rule. Commercial Molasses Corp. v. New York Tank Barge Corp., 1941, 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89. Here, the parties adopted the rules of COGSA. That Act requires the carrier to "properly load, handle, stow, carry, keep, care for and discharge the goods carried". 46 U.S.C. Sec. 1303(2). The shipper makes out a prima facie case of negligent handling under COGSA by introducing a clean bill of lading and some proof of nondelivery. The carrier then has the burden of proving that the loss was not due to its negligence, or that the loss was caused by one of the exceptions set out in Sec. 4(2) of the Act, 46 U.S.C. Sec. 1304. Socony Mobil Oil Co. v. Texas Coastal & International, Inc., 5 Cir.1977, 559 F.2d 1008, 1010.
 
 
 14
 Total CFN argues that the allocation of the burden of proof is not set out in the Act, and that the parties therefore did not intend to incorporate the COGSA burden of proof in the contract of carriage. In general, parties intending to be bound by a statute intend to be bound by the body of judicial decisions interpreting and applying the statute. In this case, moreover, the rules allocating the burden of proof are not entirely extra-statutory. To be sure, those rules predate COGSA. See The Frey, 2 Cir.1901, 106 F. 319 320-21. Section 4(2)(q) of COGSA, however, provides that the carrier has the burden of proving it was not at fault if the cause of the loss is not listed in Sec. 4(2)(a)-(p). 46 U.S.C. Sec. 1304(2)(q). Congress therefore could not have intended the shipper to bear the burden of proving negligence in every case. Most courts and commentators have concluded from the structure of Sec. 4(2) that Congress did not intend to place such a burden on the shipper in any case. See G. Gilmore & C. Black, The Law of Admiralty (2d ed. 1975) Sec. 3-43 at 184.[4]
 
 
 15
 We hold that this case is governed by COGSA, including the rules allocating the burden of proof under that Act.
 
 III.
 
 16
 Section 4(2)(m) of COGSA exonerates the carrier from liability for shortages caused by "[w]astage in bulk or weight or any other loss or damage arising from inherent defect, quality, or vice of the goods". 46 U.S.C. Sec. 1304(2)(m). The district court found that Total CFN failed to prove that the loss was due to an inherent vice of the cargo.[5] Total CFN argues that this finding is clearly erroneous.
 
 A.
 
 17
 Total CFN theorizes that the undelivered oil could not be pumped because it was extremely viscous or contained excessive amounts of paraffin. The record contains adequate evidence to support the district court's finding that the floating 12,068 barrels were liquid, pumpable crude oil. The surveying party was able to pour samples from one container to another. Even the surveyor representing Total CFN testified that the floating oil was "pumpable cargo."[6] Assays of samples taken at Ras Shukheir and St. James showed that the cargo was neither too viscous nor too loaded with paraffin.
 
 
 18
 Shell also presented evidence that the loss was caused by negligent maintenance of the GILDA and negligent unloading procedures. The GILDA's master refused to permit surveyors to inspect the cargo tanks before loading in Egypt. One of her two main cargo pumps was shut down when a major pipe rusted through during the lightering operation. Finally, the GILDA's master did not follow standard procedures for maximizing the rate of discharge at St. James.[7]
 
 B.
 
 19
 The district court held "that considering the totality of the evidence, and in particular ... the practicability of setting up a hot system ... to improve the pourability of the crude oil, in the event that viscosity was the problem, the court finds that GILDA negligently failed to deliver the remaining 12,000 barrels of oil". The expert witnesses agreed that the GILDA might have contrived to use heating coils in one of its slop tanks to liquefy the remainder of the cargo. The charter party between Total CFN and Holborn, however, includes the phrase "no heat required". Total argues that the district court's finding necessarily implies that the loss was due to an inherent vice in the cargo, and that Total therefore is blameless.
 
 
 20
 The court's findings carry no such implication. The terms of the charter party excuse Total if the oil was too thick to pump without heating. The district court did not hold that the oil was too thick to pump. On the contrary, the court held that the floating oil was "pumpable, deliverable cargo". The court's finding that a hot system was one reasonable and prudent means by which Total CFN might have solved the problem does not imply that the cargo rather than the ship caused the problem.
 
 
 21
 The district court correctly held that Holborn is not liable to the defendants for any part of the judgment.
 
 IV.
 
 22
 Total challenges the district court's computation of damages. First, Total asserts that it is entitled to the customary trade allowance of 0.5 percent recognized in such cases as United States v. Central Gulf Lines, Inc., 5 Cir.1983, 699 F.2d 243, 246. The trade allowance reflects inevitable shortages due to gauging errors, evaporation, or temperature changes. In this case, the district judge did not require the defendants to pay for missing oil. At Southwest Pass, GILDA's tanks were visually observed and manually gauged. Surveyors for ship and cargo interests agreed that the tanks contained 12,068 barrels of free-flowing, pourable, liquid oil. The court held that all 12,068 barrels could have been delivered to Shell. Shell therefore is entitled to compensation for a full 12,068 barrels of oil.
 
 
 23
 Second, Total contends that the oil in the 12,068 undelivered barrels was slop oil worth far less than GSM crude. The district court, however, found that the oil was pumpable crude oil, not slop oil. Shell therefore is entitled to the full $435,219 it paid for the undelivered oil.[8]
 
 V.
 
 24
 Finally, The West of England Ship Owners Mutual Protection & Indemnity Association argues that it is not liable because Shell presented no evidence that the loss was covered by Total's policy with The West of England. Neither The West of England nor Total listed insurance coverage as a contested issue in the pre-trial order. On the contrary, the pre-trial order identifies The West of England as "at all material times protection and indemnity underwriter of S/T GILDA".
 
 
 25
 A party need not offer proof as to matters not contested in the pre-trial order. United States v. First National Bank of Circle, 9 Cir.1981, 652 F.2d 882, 886. A contrary holding would be inconsistent with the requirement that the pre-trial order "shall control the subsequent course of the action unless modified by subsequent order". Fed.R.Civ.P. 16(e). Indeed, such a holding would not be consonant with the requirement of the first rule of the Rules of Civil Procedure: The rules "shall be construed to promote the just, speedy, and inexpensive determination of every action". Fed.R.Civ.P. 1.
 
 
 26
 The parties agree that the district court lacked in rem jurisdiction over the GILDA. The judgment against the GILDA in rem therefore is REVERSED and the case is REMANDED so that the district court may amend the judgment accordingly. In all other respects the judgment is AFFIRMED.
 
 
 
 [1]
 "GSM" is the industry abbreviation for "Gulf of Suez Mix" or "Gulf of Suez Melange". As the name implies, GSM is a blend of crude oils extracted from wells in and around the Gulf of Suez
 
 
 [2]
 The arithmetic is as follows:
 Net U.S. barrels loaded at Ras Shukneir 842,797
Less net U.S. barrels discharged at St. James -560,001
 --------
 282,796
Less net U.S. barrels lightered to the FINA
 NORVEGE -270,582
 --------
Net U.S. barrels remaining on the GILDA 12,214
 
 
 [3]
 The Clause Paramount provides:
 This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Acts of the United States, approved April 16, 1936, except that if this Bill of Lading is issued at a place where any other Act, ordinance or legislation gives statutory effect to the International Convention for the Unification of Certain Rules relating to Bills of Lading at Brussels, August 1924, then this bill of lading shall have effect, subject to the provisions of such Act, ordinance or legislation. The applicable Act, ordinance, or legislation (hereinafter called the "Act") shall be deemed to be incorporated herein and nothing contained shall be deemed a surrender by the Owner of any of its rights or immunities or an increase of any of its responsibilities or liabilities under the Act. If any term of this Bill of Lading be repugnant to the Act to any extent, such term shall be void to that extent but no further.
 We need not decide whether the parties intended the bill of lading rather than the charter party to govern their contractual relationship. Because the parties included the Clause Paramount in both documents, their relationship is governed by COGSA in either case.
 
 
 [4]
 Shell also contends that COGSA applies because the bill of lading became the contract of carriage when Holborn negotiated it to Shell. We need not and do not consider this contention
 
 
 [5]
 The district court wrote that it was not "presented with any serious evidence indicating that Holborn sold to Shell a cargo containing redhibitory defects." "Redhibition is the avoidance of a sale on account of some vice or defect in the thing sold, which renders it either absolutely useless, or its use so inconvenient and imperfect that it must be supposed that the buyer would not have purchased it, had he known of the vice." La.Civ.Code art. 2520. We do not pause to consider the difference, if any, between the civil law doctrine of redhibition and the COGSA exception for inherent vice of the cargo. We conclude that the district judge employed the adjective "redhibitory" only to refer to the COGSA exception
 
 
 [6]
 Assays of samples taken by the boarding party showed that the floating oil had a "pour point" of 75 degrees Fahrenheit. Although the test result suggests that the floating oil was too viscous to be pumped ashore, the technician testified that the test was highly unreliable in the circumstances. The technician further testified that the observations of surveyors on the scene were more reliable than the test. The district court clearly was justified in rejecting the test result in favor of the other evidence that the oil was pumpable
 
 
 [7]
 The loss of one of the main cargo pumps halved the GILDA's rate of discharge. The GILDA's master did trim the vessel by the stern to increase pressure, but he did not list her to starboard or to port, a recommended procedure in such circumstances. He emptied all the tanks at once, rather than emptying one tank at a time. Finally, he lost the benefit of pressurized inert gas in the cargo tanks by failing to close valves in the cargo tanks at the proper times. GILDA's discharge system was particularly susceptible to clogging because all 15 of her cargo tanks discharged through two free-flow tunnels
 
 
 [8]
 There is no question that the residues the GILDA discharged at Marseilles were worth far less than GSM crude oil. There is also no question that the heating and washing process used to recover the residues reduced their market value. Shell is entitled to the value of the cargo before heating and washing