TENNECO RESINS, INC., et al.,
Plaintiffs–Appellants,

v.

DAVY INTERNATIONAL, AG, et al., Defendants,

Atlantic Cargo Services, AB, et al.,
Defendants–Appellees.

No. 88–2861.

United States Court of Appeals,
Fifth Circuit.

Aug. 29, 1989.

John F. Waldo, Clann, Bell & Murphy, Houston, Tex., for plaintiffs-appellants.

**212**

William H. Seele, Houston, Tex., for defendants-appellees.

Before GEE, REAVLEY and JOLLY, Circuit Judges.

REAVLEY, Circuit Judge:

Tenneco Resins, Inc. ("Tenneco"), the plaintiff in this cargo-loss suit, appeals from the district court's entry of judgment in favor of the carrier, Atlantic Cargo Service ("ACS"). We affirm.

## I.

In May 1980, Tenneco arranged to buy chemical catalyst from Davy McKee International AG. The catalyst, which was manufactured at Regensberg, Germany, was sprayed onto ceramic beads and packed inside polyethylene bags which in turn were placed inside non-moistureproof metal drums. The lids of most of the drums were marked with an umbrella stencil—the universal symbol indicating that cargo should be kept dry. The manufacturer placed the 870 drums on pallets, loaded the pallets aboard closed railroad cars and shipped them to the North Sea Port of Bremen, West Germany. Bremer Lagerhaus Gesellschaft ("BLG") stacked the pallets three tiers high onto two stackmasters and two flats and tendered the cargo to ACS agents. ACS representatives then issued to Tenneco a clean bill of lading, which recited that the drums were in apparent good order and condition.

The cargo was shipped to Houston in the fall of 1982 aboard the M/V FINN ROSE. After representatives of ACS and Strachan Shipping Co., the stevedore, inspected the cargo in the ship's hold, it was unloaded onto an open dock. Shortly thereafter, a rainstorm hit the area and the drums got wet. A Tenneco representative then asked that the drums be placed inside a warehouse. An inspection revealed that water had penetrated not only many of the drums but also the plastic bags in which the catalyst was packed. Some 535 of the 870 drums contained catalyst that was so damaged as to be unusable for its intended purpose; accordingly, replacement catalyst had to be purchased.

In August 1983, Tenneco filed suit against ACS, Strachan, the catalyst manufacturers, and the freight forwarder seeking in excess of $680,000 in damages. The district court ordered the improper packaging claim against the defendant manufacturers to arbitration [1] and granted summary judgment in favor of the defendant freight forwarder on the ground that, since it neither saw the cargo nor received information from Tenneco regarding the need to keep the cargo dry, it could not be held liable for failing to include such information on the shipping documents. Liability of ACS (the carrier) and Strachan (the stevedore) was then tried to the court. We have only Tenneco's appeal of the resulting judgment in favor of ACS; no appeal was taken as to Strachan.

In its findings of fact and conclusions of law, the district court found (1) that ACS was never given written or verbal instructions to keep the cargo dry, (2) that metal drums are assumed to be watertight and, if they are not, umbrella symbols customarily are marked on drum sides to indicate such, (3) that only three of 870 drums had umbrellas on their sides, while the rest had markings, many of which were "illegible or smudged," on their lids, (4) that, because of the way the drums were stacked for shipment, the umbrella symbols were "virtually unnoticeable," and (5) that in Houston steel drums routinely are unloaded onto open docks absent special instructions to the contrary. Concluding that ACS had neither actual nor constructive knowledge of the need to protect the drums from moisture, the court ruled that ACS was not liable for the loss of the cargo. Instead, "Plaintiffs were solely responsible for loss of the cargo ... because they failed to

---

**1.** Tenneco and the manufacturers ultimately settled their dispute for $300,000; the manufacturers then were realigned as plaintiffs.

exercise due care before entrusting the cargo to ACS."

## II.

■ The parties stipulated that this case is governed by the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C.App. § 1300 et seq. There are four steps involved in COGSA litigation. First, the claimant must establish a prima facie case of liability against the carrier by proving that the carrier received the cargo in good condition but delivered it at its destination in damaged condition. *Blasser Bros., Inc. v. Northern Pan–American Line,* 628 F.2d 376, 381 (5th Cir.1980). Second, the burden then shifts to the carrier to prove that it exercised due diligence to prevent the damage or that harm was occasioned by one of the excepted causes set out in 46 U.S.C. § 1304(2). *Id.* Third, if the carrier meets its burden, the burden shifts back to the claimant to show that carrier negligence was at least a concurrent cause of the loss. *Id.* at 382. Fourth, if the shipper shows such negligence, the burden returns to the carrier, who must prove the portion of the loss caused by negligence and the portion caused by other factors. If the carrier is unable to do this, it is fully liable for the shipper's loss. *Id.*

It is undisputed that Tenneco made out its prima facie case and that ACS rebutted it. Tenneco stipulated that, for the purposes of this action, the packaging was insufficient within the meaning of 46 U.S.C.App. § 1304(2)(n).[2] The alleged error in this case occurred at the third step of the analysis. The district court held that ACS was not in any way negligent and that the sole responsibility for the loss should be borne by Tenneco and the manufacturers of the catalyst. Tenneco claims that, in so holding, the district court failed to impose upon ACS the proper legal duty. That is, the court should have imposed upon ACS, as the carrier, a duty to inspect the cargo

tendered for carriage. According to Tenneco, if such an inspection had been performed, ACS would have discovered the umbrella symbols and would have kept the drums dry; therefore, by failing to inspect, ACS was negligent and must be charged with knowledge of what that inspection would have revealed.[3]

■ In defining the responsibilities and liabilities of parties under COGSA, Congress, with some degree of specificity, chose to impose upon carriers the duty to "properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried." 46 U.S.C.App. § 1303(2). Congress did not include in this list of duties a general duty to inspect cargo tendered for carriage. "Thus, absent extraordinary circumstances to be shown by the shipper, the courts will not normally require the carrier to do more than Congress required of it pursuant to carefully drafted statutory language." *O'Connell Machinery Co. v. M/V Americana,* 797 F.2d 1130, 1134 (2nd Cir.1986).

■ The parties agree that a carrier is not required to examine the contents of every package delivered to it for carriage. *See Berisford Metals Corp. v. S/S Salvador,* 779 F.2d 841, 847 (2nd Cir.1985), *cert. denied,* 476 U.S. 1188, 106 S.Ct. 2928, 91 L.Ed.2d 556 (1986). A carrier is required, however, at the request of the shipper, to issue a clean bill of lading showing, among other things, "[t]he apparent order and condition of the goods." 46 U.S.C.App. § 1303(3)(c). This suggests that the carrier must make at least some sort of inspection of the cargo's external condition. The question, however, is how thorough that inspection must be. In addressing this issue, we are guided by the language of COGSA as well as by industry custom and practice.

■ As the district court found, it is a custom in the industry "to load and unload

---

**2.** 46 U.S.C.App. § 1304(2)(n) provides as follows:

    (2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—

.     .     .     .     .

    (n) Insufficiency of packing. . . .

**3.** Tenneco does not dispute that ACS was unaware of the umbrella symbols on the drums.

flats and stackmasters by unit numbers so that the carrier does not have to inspect each pallet or individual drum for shipping marks." It also is customary for metal drums that are used for transporting goods to be waterproof; if the drum is not waterproof, the custom is to stencil an umbrella symbol on the drum's *side* so that it can be seen. Tenneco does not argue convincingly that these are not the industry customs. The main thrust of its argument, instead, is that, because the manufacturer delivered pallets of drums in single tiers to BLG, who then stacked the pallets in three-tiered units, ACS had a duty to dismantle the flats and stackmasters and inspect single tiers of drums prior to loading them.

We are unpersuaded that ACS had any such duty. As the Second Circuit wrote in *O'Connell Machinery Co.*, 797 F.2d at 1134, "[w]hile there is some authority requiring the carrier at least to exercise due diligence in attending to visible packaging inadequacies, ... [a]bsent such apparently inadequate packing or other extraordinary circumstances," the carrier is not obligated to inspect the cargo. To the contrary, the shipper has an obligation to inform the carrier of the cargo's special requirements. "This view places the burden of inspection and ascertainment of special stowage needs on the party most likely to know of or best equipped to discover such needs." *Id.*

In this case, there were neither apparent inadequacies in packaging nor extraordinary circumstances. The catalyst was packed in metal drums that ordinarily are waterproof. The drums were placed onto pallets and then stacked onto flats and stackmasters for loading in accordance with industry custom. Because the manufacturers, contrary to the accepted practice, stenciled umbrella symbols on the drum lids rather than on the drum sides, the symbols could not be seen when ACS representatives inspected the external condition of the cargo prior to issuing the bill of lading.

Tenneco argues, however, that the fact that the umbrella symbols could not be seen once the pallets were stacked should not be an excuse for ACS since, when BLG loaded the pallets onto flats and stackmasters, it was functioning as an agent of ACS.[4] We disagree. As we noted above, in unitizing the pallets in this manner, BLG was acting in accordance with industry custom. Tenneco and the manufacturers reasonably should have expected that this would be done and should have marked the drums accordingly. Once the pallets were stacked, ACS had no duty to disassemble each shipping unit to inspect each tier of drums individually. To require such would be inconsistent both with industry custom and with COGSA's language requiring the carrier to attest to the cargo's "*apparent* order and condition." *See* 46 U.S.C.App. § 1303(3)(c) (emphasis added). We refuse to impose upon carriers any greater duty than that which already exists under well-settled law and practice.

Tenneco also suggests that a duty to inspect the drum lids may arise from the requirement that the carrier issue a bill of lading showing "[t]he leading marks ... stamped or otherwise shown clearly upon the goods." 46 U.S.C.App. § 1303(3)(a). Since the shipping marks were on the drum lids in this case, Tenneco asserts, ACS had a duty to examine those lids. This argument is without merit. As we noted earlier, the district court found that it is customary in the shipping industry to load and unload cargo units by unit number so that the carrier does not have to inspect each pallet or individual drum for shipping marks.

The judgment of the district court is AFFIRMED.

---

**4.** Tenneco does not argue that BLG representatives actually saw the umbrella symbols and that this knowledge should be imputed to ACS.