United States Court of Appeals,

Fifth Circuit.

No. 93-3400.

SUN COMPANY INC. and Sun Oil Trading Company, Plaintiffs-Appellants,

v.

S.S. OVERSEAS ARCTIC, Overseas Bulktank Corporation, and BP Oil Shipping Co., U.S.A., Defendants-Appellees.

Aug. 8, 1994.

Appeal from the United States District Court for the Eastern District of Louisiana.

Before JOHNSON, BARKSDALE, and DeMOSS, Circuit Judges.

JOHNSON, Circuit Judge:

This case calls on the Court to determine whether the M/T OVERSEAS ARCTIC, Overseas Bulktank Corporation, and BP Oil Shipping Company (collectively referred to as "Carriers") breached their duty to properly and carefully load, carry, care for, and discharge high-temperature fuel oil[1] under the Carriage of Goods by Sea Act ("COGSA") during a voyage from Guayanilla, Puerto Rico, to the ports of Good Hope and St. Rose, Louisiana. The district court found that the carriers did not violate said duties. This Court agrees and therefore affirms.

I. Facts and Procedural History

On March 25, 1991, Sun Oil Trading Company ("Sun") contracted to sell Clarendon Marketing, Inc., 300,000 barrels of straight run

_____

[1]High-temperature fuel oil solidifies or congeals at high temperatures and often requires heat to remain in a liquid state.

1

fuel oil for $18.50 per barrel. To carry out this arrangement, Sun entered a Tanker Voyage Charter Party with the Carriers. In this charter party, Sun agreed to charter one of the Carrier's vessels. The Carriers, in turn, agreed to transport Sun's straight run fuel oil from Guayanilla, Puerto Rico, to two ports in Louisiana—Good Hope and St. Rose. The Carriers also covenanted to provide a vessel which could heat the cargo up to a maximum temperature of 135 degrees and maintain that temperature.[2] Anticipating that the Carriers would only be required to *maintain* the temperature of the fuel, as opposed to *increasing* the temperature, the parties deleted the contract's penalty for failing to increase the cargo's temperature.[3]

Consistent with this expectation, the charter party's Maraven Cargo Heating Clause expressly provided that "unless otherwise requested by Charterer, Vessel shall only be required to maintain

---

[2]All temperatures referred to herein are measured in Fahrenheit.

[3]The Maraven Cargo Heating Clause in the original contract placed upon the Carriers a duty to increase and maintain the temperature of the cargo to a maximum of 135 degrees if ordered to do so by Sun. The contract also provided a penalty for the Carriers' failure to properly heat the cargo. The penalty portion of the contract stated that if the vessel "fails to maintain the loaded temperature *or to increase and maintain the temperature* of the cargo, as requested by Charterer, Charterer shall have the option to hold Vessel off berth and/or to suspend discharging all until the cargo is properly heated, all time and expense in connection with the foregoing being for [Vessel] Owner's account." Exh. 2 (emphasis added). Although the parties left undisturbed the provision which required the vessel to increase the temperature of the fuel oil if so ordered, the parties deleted the italicized portion of the Heating Clause, providing a penalty only for the vessel's failure to *maintain* the loaded temperature.

2

the cargo at the temperature loaded ... throughout the voyage and the entire discharge."  Assuming that Sun—the charterer—would not order the chartered vessel to increase the temperature of cargo, the Carriers designated the M/T OVERSEAS ARCTIC as the vessel to transport Sun's cargo.[4]

On March 27, 1991, the OVERSEAS ARCTIC arrived at the loading port at Guayanilla, Puerto Rico.  It commenced loading Sun's straight run fuel oil on the following day.  Richard Beza, the captain of the OVERSEAS ARCTIC, complained to the port terminal that the loading of the cargo was taking much longer than anticipated.  In a letter of protest to the terminal, the captain contended that the delay was due to the low temperature of the fuel.  Unbeknownst to Captain Beza, the vast majority of the cargo was loaded at temperatures lower than the cargo's pour point.[5]  Although the captain was displeased with the slow rate of the loading, he testified that neither the loading nor the temperature of the cargo raised concerns in his mind, for the fuel was

---

[4]Although the OVERSEAS ARCTIC could *maintain* the temperature of the cargo up to 135 degrees, it could not *increase* the temperature thereof.

[5]The pour point is the temperature at which liquid begins to solidify, such that it can no longer be poured.  In this case, the pour point of the fuel oil was 95 degrees.  Captain Beza explained during trial that 218,000 of the 330,000 barrels loaded on the vessel came aboard at temperatures ranging between 86 and 89.9 degrees.  One third of the oil had a load temperature which fluctuated between 101 and 108.3 degrees.  The temperature of the remainder of the fuel, just 3000 barrels, was 115 degrees.  This cargo was combined on the ship, resulting in an average temperature of 93.6 degrees, a temperature lower than the pour point.

3

obviously fluid enough to be pumped on board the vessel.[6]  He nevertheless sent a telex to Sun, informing the company that the temperature of the cargo coming aboard was between eighty nine and ninety degrees.  He advised Sun that the vessel was "putting heat on cargo immediately" and that it would "maintain load temperature."

After three days of loading, the OVERSEAS ARCTIC departed Guayanilla and headed for the Louisiana ports.  In its voyage orders to the OVERSEAS ARCTIC, Sun directed Captain Beza only to maintain the loaded temperature of the fuel.[7]  Sun did not alter this order at any time throughout the OVERSEAS ARCTIC's voyage.  Captain Beza claimed at trial that the Carriers complied with Sun's orders.  In fact, he testified that the vessel not only maintained the temperature in accordance with industry standards, but the vessel actually increased the temperature of the fuel in some of the tanks.  Indeed, the average temperature of the fuel at discharge was 89.9 degrees, three-tenths of a degree higher than the loaded temperature.  Nevertheless, as the ship moved from the warmer Caribbean waters—which, at that time, were eighty degrees—to cooler Mississippi River waters—which were fifty eight degrees—the

---

[6]Captain Beza testified that the industry standard required that the fuel be loaded at 20 to 30 degrees above the pour point. Not knowing the actual pour point of the cargo, Captain Beza had no reason to believe that the fuel's temperature failed to meet this standard.

[7]Captain Beza testified that he did not know that Sun expected the vessel to have heating capabilities.  As was customary, the Captain never received a copy of the charter party which, in this case, was the only document which stated that the ship was to have such capabilities.

cargo located closest to the skin of the single-skin vessel began to congeal.

Upon reaching the first discharge port in Good Hope, Louisiana, Captain Beza recognized that the ship would have problems unloading the cargo. He therefore informed BP's shore captain, Captain Maslen, of the problems. Captain Maslen contacted Sun and informed Sun that it needed to have barges immediately available at the second discharge port. Captain Maslen explained that any delay could cause further cooling and solidification of the fuel. The request went unheeded. The OVERSEAS ARCTIC was required to wait more than thirty-four hours before it was allowed to begin discharge operations. The low load temperatures, the cooler Mississippi waters, and the delay in discharge operations caused 8734 barrels of fuel oil to solidify and therefore remain on board ("ROB").[8] Sun and the Carriers unsuccessfully sought ways to discharge the ROB from the ship. After meeting failure at every turn, Sun released the OVERSEAS ARCTIC to go to its next destination.

The vessel traveled to Coatzacoalcos, Mexico, where it loaded crude oil for Petrocanada Products. The crude oil acted as a solvent and melted the ROB. When it arrived at its discharge port in Portland, Maine, the OVERSEAS ARCTIC unloaded not only Petrocanada's cargo, but also the ROB from Sun's voyage. The

---

[8]Sun attempted at trial to prove that 10,444 barrels of the cargo remained on board. However, we agree with the district court that the ship retained just 8734 barrels of the fuel oil. Notably, Sun's representative at the discharge ports confirmed that the ROB consisted of only 8734 barrels of the fuel oil.

5

Carriers did not charge Petrocanada for the excess cargo. Hence, the ROB inured totally to Petrocanada's benefit.

Sun later brought this action against the M/T OVERSEAS ARCTIC, Overseas Bulktank Corporation, and BP Oil Shipping Co. for the loss of its cargo. After a bench trial, the district court ruled that Sun, having failed to prove that the cargo was in good order when loaded, had failed to make out its *prima facie* case. The district court further held that Sun had breached its duty to load the high-temperature fuel oil at a proper temperature. Concluding that the Carriers had fully complied with their obligations to Sun, the court entered judgment in favor of the Carriers and against Sun. Sun appeals.

## II. Discussion

A. Carriage of Goods by Sea Act

The parties initially dispute whether rules applicable to private carriage contracts or provisions outlined in the Carriage of Goods by Sea Act ("COGSA") control in this action. By its own terms, COGSA applies only if the bill of lading or another similar document of title evidences the contract for the carriage of goods by sea. 46 U.S.C. § 1300; *Shell Oil Co. v. M/T GILDA,* 790 F.2d 1209, 1212 (5th Cir.1986). If one charters an entire vessel, however, the charter party controls, not the bill of lading. *Id.* at 1212. Hence, in that situation, COGSA is inapplicable. Nevertheless, parties may incorporate the terms of COGSA into their charter party provisions. When parties so do, COGSA controls, but only to the extent provided in the charter party. *Id.* If parties

6

therefore incorporate COGSA provisions, in their entirety, into the terms of their private carriage contract, COGSA will govern the entire transaction.

In this case, as in *Shell Oil,* the parties evidenced their intent that COGSA govern the entirety of their venture in the charter party's Clause Paramount. That clause, in pertinent part, reads as follows: "This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Acts of the United States."[9] In view of the charter party's full incorporation of COGSA in this case, we hold that COGSA controls here.

B. Applicability of COGSA

As this Court so appropriately declared in *Nitram, Inc. v. Cretan Life,* "[t]o enforce their respective rights under [COGSA],

---

[9]The Clause Paramount in this case is almost identical to the Clause Paramount adopted by the parties in *Shell Oil.* The entire clause in the charter party under review here provides the following:

> This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Acts of the United States, approved April 16, 1936, except that if this Bill of Lading is issued at a place where any other Act, ordinance or legislation gives statutory effect to the international Convention for the Unification of Certain Rules relating to Bills of Lading at Brussels, August 1924, then this Bill of Lading shall have effect, subject to the provisions of such Act, ordinance or legislation. The applicable Act, ordinance or legislation (hereinafter called the "Act") shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the Owner of any of its rights or immunities or an increase of any of its responsibilities or liabilities under the Act. If any term of this Bill of Lading be repugnant to the Act to any extent, such term shall be void to the extent but no further.

*See Shell Oil,* 790 F.2d at 1212 n. 3.

litigants must engage in the ping-pong game of burden-shifting mandated" by sections 1303 and 1304 of the Act. 599 F.2d 1359, 1373 (5th Cir.1979). To present a *prima facie* case under COGSA for the loss of cargo, a charterer must initially prove that the carrier failed to deliver all of the goods initially loaded. *See Tenneco Resins, Inc. v. Davy International., AG*, 881 F.2d 211, 213 (5th Cir.1989); *Horn v. Cia de Navegacion Fruco, S.A.,* 404 F.2d 422, 435 (5th Cir.1968). The charterer's proffer of the bill of lading creates the rebuttable presumption that all of the cargo listed in the document was, in fact, loaded upon the carrier's vessel in the condition therein described. *Blasser Bros. v. Northern Pan-American Line,* 628 F.2d 376, 381 (5th Cir.1980).

Once the charterer presents its *prima facie* case, the burden shifts to the carrier to prove either that it exercised due diligence in preventing the loss of the cargo or to prove that the loss was caused by at least one of the exceptions set out in section 1304(2) of COGSA. *Tenneco Resins, Inc.,* 881 F.2d at 213. If the carrier successfully rebuts the charterer's *prima facie* case, the burden returns to the charterer to prove that the carrier's negligence was at least a concurring cause of the loss. *Id.* If the charterer meets this challenge, the carrier must finally satisfy the heavy burden of proving the percentage of loss due to its negligence and the percentage of loss due to the charterer's negligence. *Id.* If the carrier fails to prove the proportionate fault of each of the parties, the carrier becomes liable for the entire loss. *Id.*

1. Sun's *Prima Facie* Case

Sun proffered the Tanker Bill of Lading, signed by Captain Beza, which showed that 329,686.27 barrels of straight run fuel oil was loaded upon the OVERSEAS ARCTIC in Guayanilla, Puerto Rico. According to Caleb Brett, Sun's representative at the discharge ports, the vessel delivered all but 8734 barrels of fuel at the Good Hope, Louisiana, and St. Rose, Louisiana, ports. The tendering of the bill of lading, combined with the evidence that the Carriers failed to discharge all of the 329,686.27 barrels of the fuel sufficiently established Sun's *prima facie* case.[10]

2. Statutory Exception

The burden therefore shifted to the Carriers to prove that they either acted with due diligence or that one of the statutory exceptions in section 1304(2) applies. The Carriers charged, and the district court found, that because the fuel oil was not loaded at twenty to thirty degrees above its pour point, two provisions in section 1304(2) absolved the Carriers of liability. The first provision argued by the Carriers is subsection (m), which provides an exception to a carrier's liability if the loss was caused by an "inherent defect, quality, or vice of the goods." 46 U.S.C. §

---

[10]The district court therefore erred in ruling that Sun failed to make out its *prima facie* case. This Court has made clear that the charterer proves its *prima facie* case when it presents a bill of lading which shows that the carrier accepted the goods in the condition shown therein. *Blasser Bros.,* 628 F.2d at 381; *Horn,* 404 F.2d at 435; *see C. Itoh and Co. v. M/V HANS LEONHARDT,* 719 F.Supp. 479, 503 (E.D.La.1989) (noting that the Fifth Circuit has never required the charterer to disprove the existence of an inherent defect in the cargo as part of its *prima facie* case).

1304(2)(m). The second provision proffered by the Carriers, subsection (i), excuses carriers from liability for the loss of cargo if the loss was caused by the "[a]ct or omission of the shipper or owner of the goods, his agent or representative." Although we agree that the latter provision exonerates the Carriers from any liability, we disagree that the former provision is applicable in the case *sub judice.*

### a. Inherent Defect

By its clearly expressed terms, subsection (m) applies only when the defect, quality, or vice is inherent in the cargo. As this Court explained in *Quaker Oats Co. v. M/V Torvanger,* to prove that the inherent defect provision applies, the carrier must show that some defect, quality, or vice existed *within the cargo, itself.* 734 F.2d 238, 241 n. 3 (5th Cir.1984). Consistent with our construction of this provision, every carrier in every section 1304(2)(m) case argued before this Court, prior to this case, has contended that a condition inherent in or on the goods at issue caused the loss or damage in question.

In *Shell Oil,* the carriers complained that the fuel oil there contained excessive amounts of paraffin which caused the cargo to become extremely viscous and, hence, unpumpable. 790 F.2d at 1213. The carriers in *Quaker Oats* contended that a peroxide formation within the cargo, tetrahydrofuran, was an inherent vice. 734 F.2d at 241. Similarly, in *Harbert International Establishment v. Power Shipping,* (5th Cir.1981) the carriers asserted that pipes which they transported contained defective seal coats. 635 F.2d 370, 374

10

(5th Cir.1981).  Finally, in this Court's only other section 1304(2)(m) case, *Horn v. Cia de Navegacion Fruco S.A.,* the carriers argued that bananas which they transported had been loaded in an overly ripe condition.  404 F.2d at 435.

These cases are all readily distinguishable from the facts of this case.  The temperature of the fuel oil transported by the OVERSEAS ARCTIC in this case did not constitute an *inherent* defect. A defect—perhaps;  however, the defect, unlike those in the above-reviewed cases, was due to *external,* as opposed to *internal* conditions.  A simple change in the external conditions could have easily remedied the fuel oil's temperature problems.  Thus, based upon the explicit terms of subsection (m), as well as our construction of that provision in *Quaker Oats,* this Court finds that the inherent defect exception is unavailable to the Carriers here.

### b. Sun's Act or Omission

The district court also found that Sun's failure to load the cargo at temperatures which reached at least twenty to thirty degrees above the pour point caused the loss of the fuel.  We agree.  Witnesses for both Sun and the Carriers testified that the industry standard required high-temperature fuel oil to be loaded twenty to thirty degrees above the pour point.[11]  These witnesses explained that the industry requires such oil to be loaded at high temperatures because transportation in oft-times cooler waters will

---

[11]In *Tenneco Resins, Inc.,* we recognized that industry standards are appropriate guides in COGSA cases. *See Tenneco Resins, Inc.,* 881 F.2d at 213-14.

11

cause a decrease in the temperature of at least some of the oil.

In the case *sub judice,* Sun failed to meet this industry standard. There is no dispute that the average temperature of the cargo in this case, when loaded, was below the pour point. Sun had the duty to ensure that fuel oil was pumped on board at a sufficient temperature.[12] Its failure to perform this obligation, without doubt, caused the ROB. The exception set forth in section 1304(2)(i) therefore applies in this case.

3. Carrier Negligence

Because the Carriers proved that section 1304(2)(i) applies, the burden returned to Sun to prove that the Carriers' negligence at least partially caused the loss of the cargo. Attempting to satisfy this burden, Sun contends that even if the load temperature was inadequate, the Carriers' provided an unseaworthy vessel. The unseaworthiness of the vessel, according to Sun, caused the loss of its cargo. Sun additionally avers that the Carriers failed to maintain the loaded temperature of the fuel, as required by the charter party and the voyage orders. Finally, Sun argues that the Carriers failed to exercise due diligence to ensure that the cargo was properly heated. We find no merit in any of Sun's contentions.

a. Unseaworthiness

---

[12]Although Sun claims that it had no control over the shore facility which loaded the oil, we note that that facility acted as Sun's agent, since it loaded the oil at Sun's behest. *See Sigri Carbon Corp. v. Lykes Bros. Steamship Co., Inc.,* 655 F.Supp. 1435, 1440 (W.D.Ky.1987) (ruling that when the charterer hires a stevedore to load a ship, any damage due to the loading is a result of an act or omission of the shipper, his agent, or representative).

12

Sun first argues that the OVERSEAS ARCTIC was unseaworthy because it could not raise the temperature of the cargo to 135 degrees as required in the charter party. The Carriers conceded that such was the case. However, there is no dispute that Sun, at no time during the voyage, requested that the temperature be raised. To the contrary, it specifically ordered the vessel to *maintain* the loaded temperature.[13] Had Sun ordered the Carriers to increase the temperature during the voyage, we would agree with Sun's argument here.[14] However, to carry its burden at this point, Sun must prove that the unseaworthy condition in question not only

_____

[13]Even Sun's coordinator for loading and discharging operations, Susan O'Connor, testified that this order meant exactly what it said. The Carriers questioned Ms. O'Connor on the meaning of this instruction:

> Q. Now you will notice in the voyage orders, those are Sun voyage orders, under "heating," "Vessel maintain loaded temperature up to 135 degrees Fahrenheit." That means that whatever the loading temperature was, the vessel would keep it at that temperature; is that correct?
>
> A. Yes.
>
> Q. So, if the cargo came aboard at 89 degrees, the vessel under those instructions would keep it at 89 degrees?
>
> A. Yes. That's right.
>
> Q. If it came aboard at 90 degrees, they would keep it at 90 degrees?
>
> A. Yes.

[14]The COGSA provision most applicable in this argument is not the seaworthiness provision, but section 1303(1)(c) which places upon carriers the affirmative duty to make all "parts of the ship in which goods are carried[ ] fit and safe for their reception, carriage, and preservation." 46 U.S.C. § 1303(1)(c).

13

*existed,* but actually *caused* the loss of the cargo. *See Bruszewski v. Isthmian S.S. Co.,* 66 F.Supp. 210 (D.C.Pa.), *aff'd,* 163 F.2d 720 (3d Cir.1947), *cert. denied,* 333 U.S. 828, 68 S.Ct. 451, 92 L.Ed. 1113 (1948). This, Sun has not done. By failing to order the Carriers to increase the temperature of the cargo, Sun never provided the Carriers the opportunity to breach their duty to provide a seaworthy vessel and to ensure that the vessel's storage tanks could properly preserve the fuel oil.[15] Sun's seaworthiness claim therefore fails.

b. Proper Maintenance of the Temperature

Sun next complains that the Carriers did not maintain the temperature of the oil. This contention is logical: If some of the oil cooled to such an extent that it solidified, the Carriers clearly failed to maintain the temperature of that portion of the oil. Captain Beza, in so many words, admitted that such was the case. However, the captain testified that an order to maintain the loaded temperature does not require vessels to maintain every square inch of the cargo at one temperature. According to Captain Beza, a "maintain heat" order requires vessels to maintain the *average* temperature of their cargo. Captain Beza testified that his interpretation of the order was consistent with the standards in the high-temperature fuel oil transportation industry. Sun

_____

[15]Averring that the law does not require one to do a vain thing, Sun argues that it would have been vain to order the ship to raise the temperature. This axiom is not helpful to Sun's case. The basic premise underlying this axiom is that one who fails to act must *know* that his act would be vain. One who fails to act out of ignorance or neglect may not take advantage of this principle.

14

proffered no testimony or evidence which contradicted the Carriers' contention that, based upon industry standards, the vessel complied with Sun's orders.[16] Sun's argument that the Carriers failed to maintain the load temperature is therefore not well taken.

### c. Special Knowledge Requirements

Sun finally argues that the Carriers had a duty under COGSA to know the special characteristics and heating requirements of the cargo and to properly carry, care for, and discharge the cargo. Sun is only partially correct. COGSA does, indeed, expressly require carriers to "properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried." 46 U.S.C. § 1303(2); *Shell Oil Co.*, 790 F.2d at 1213. However, this Circuit has rejected the argument that carriers have a legal duty to learn the special needs of their cargo. *Tenneco Resins, Inc.*, 881 F.2d at 214. To the contrary, we have ruled that the *charterer* "has an obligation to inform the *carrier* of the cargo's special requirements." *Id.* (emphasis added). We have determined that this view properly places the burden to discern cargo's special stowage needs upon the party which will most likely know or have

---

[16]Our review of the record reveals that the Carriers not only maintained the average temperature of the cargo, but they actually increased the temperature of the fuel oil by three-tenths of one percent. The record also shows that Caleb Brett, Sun's representative at the discharge port, agreed that the Carriers had accomplished Sun's heating requirements during the voyage. During a phone call placed after the OVERSEAS ARCTIC left the first Louisiana port, a Caleb Brett employee informed Sun's discharge coordinator, Susan O'Connor, that the Carriers had increased the temperature of the cargo. Caleb Brett's analysis of the situation confirms Captain Beza's testimony that Sun's "maintain-heat" order merely required the vessel to maintain the average temperature of the cargo.

access to knowledge of such needs. *Id.* (quoting *O'Connell Machinery Co. v. M/V Americana,* 797 F.2d 1130, 1134 (2d Cir.1986)).

Consistent with our *Tenneco Resins, Inc.,* decision, Captain Beza testified that he expected Sun to know the pour point of the fuel oil and ensure that it came aboard at the proper temperature. Although Captain Beza informed Sun of the load temperature prior to departing Guayanilla,[17] Sun, in the best position to know the pour point of the cargo, did not respond. Sun neither informed the Carriers of the pour point nor, more importantly, instructed the Carriers to increase the temperature of the cargo. Even if Captain Beza had recognized a problem with the temperature of the cargo, and even if the OVERSEAS ARCTIC had possessed heating capabilities, Captain Beza could have discharged his duties in no different manner, for he was under express orders to *maintain,* not *increase,* the temperature of the oil. We will not penalize the Carriers for following Sun's specific instructions.

### III. Conclusion

The district court erred in holding that Sun failed to present a *prima facie* case. However, its ultimate decision—that Sun breached its duty to ensure that the temperature of the cargo exceeded that pour point by twenty to thirty degrees during loading and that the breach of that duty caused Sun's loss—was correct. Because Sun did not prove that any negligence of the Carriers

---

[17]Captain Beza testified that he informed Sun of the temperature and told Sun that the OVERSEAS ARCTIC would immediately apply heat to the cargo simply to let Sun know that he was following the voyage orders.

16

contributed to the loss, this Court AFFIRMS.